Pascarella *v.* Pittsburgh Railways Company, Appellant.

Argued March 27, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

reargument refused May 17, 1957.

*Leo Daniels,* with him *James A. Geltz* and *Prichard, Lawler & Geltz,* for railways company, defendant, appellant.

*Kim Darragh,* with him *George Y. Meyer,* for Chizmar, appellant.

*Gerald N. Ziskind,* for appellees.

OPINION BY MR. JUSTICE MUSMANNO, April 26, 1957:

On the morning of October 14, 1953, at about 8 o'clock, four Wilkinsburg School pupils decided that it was "too lovely a morning to be in school." Quickly they planned on a carefree day to enjoy whatever innocent diversion and harmless adventure might present itself. They first entered the sylvan retreat of Frick Park where they consumed their lunches, and then they proceeded to the grass circle in the Park where automobiles pass by, hoping to board a car which would take them anywhere out of the confines of Wilkinsburg, thus reducing the chances of their parents' knowing that they had cut classes for the day. The girls participating in this excursion which was to be dedicated to fun and merrymaking, but which ended in tragedy, were Judith and Joyce Long, twins, 14 years of age; Mary Pascarella, 15 years of age; and Ruth Craig who is not involved in these proceedings.

After several cars went by they hailed a green truck, owned and operated by John Chizmar, and asked him for a ride. Some conversation ensued and the girls climbed on to the vehicle, taking places in the open body of the truck. Chizmar now headed for his destination, to reach which, because of certain detours, he would pass through the intersection of Homewood Avenue and Penn Avenue in the city of Pittsburgh.

As the truck proceeded in a northward direction on Homewood Avenue approaching Penn Avenue, a street car moved westwardly on Penn Avenue approaching Homewood. The vehicles arrived at the intersection simultaneously, and the inevitable collision occurred, bringing disastrous results to the itinerant school girls. Judith Long was fatally hurt, dying two hours after the accident, and the other girls sustained serious injuries.

William E. Long, Administrator of the estate of Judith Long, brought suit against the Pittsburgh Railways Company and John Chizmar. The minors Mary Pascarella and Joyce Long, through their appropriate representatives, also brought suit against the Pittsburgh Railways Company and John Chizmar. The Pittsburgh Railways Company and John Chizmar sued each other for damages done to their respective vehicles. The different causes were tried together.

At the trial there was conflicting testimony as to what orally transpired between the girls and Chizmar before they boarded the truck. The girls' version of the colloquy was that Chizmar made several offers as to the manner in which he would transport them: (1) that he would take two of the girls to their destination and then return for the other two; (2) that all four girls could sit in the cab with him; (3) that two could ride with him in front and two in the rear. The girls replied that he would be impeded in his driving if they shared the cab with him, nor would they accept either of his other suggestions since this would mean separating the girls. Finally it was agreed that the four girls would occupy the body of the truck.

Chizmar's version of the conversation was all to the contrary. He said that the girls got into his truck without his knowledge or consent, that he ordered them off but they refused to leave, and that he then pro-

ceeded on his journey, fully resolved to take his demanding passengers to the police station which was on the route to which he was committed. The police station he described turned out later to be a fire station.

This conflict in stories as to whether the girls were accepted passengers on Chizmar's truck or unwanted riders became an ardently contested focal point of controversy during the trial. The forensic battle was apparently taken up by the jurors who finally reached the conclusion that Joyce Long and Mary Pascarella were not entitled to any award because they "didn't belong on that truck." One of the jurors (No. 4) specifically made this declaration in open court when the verdicts were being announced.

Although stating that the two injured girls had no right to be on the truck, the jury nonetheless awarded damages to their parents for medical expenses and also awarded substantial sums to the estate of the deceased Judith Long, who occupied the same physical and legal position in the truck as did the injured girls. Briefly summarized the verdicts were as follows: 1. $2500 on the Death Action and $5000 on the Survival Action against the Pittsburgh Railways Company because of the death of Judith Long. 2. $787.75 against the Pittsburgh Railways Company and in favor of William Long, father of Joyce Long, for medical expenses incurred for Joyce Long, but nothing to Joyce Long herself. 3. $1498.55 against the Pittsburgh Railways Company in favor of the parents of Mary Pascarella for medical expenses, but nothing to Mary Pascarella. In all verdicts, John Chizmar was exonerated of liability.

The plaintiffs moved for a new trial, the Railway Company moved for a remolding of the verdicts and for judgments n.o.v., and John Chizmar argued against

a new trial. The lower Court ordered a new trial against both defendants and refused the motions of the Railways Company to remold the verdict and for judgments n.o.v.

The lower Court was entirely justified in awarding a new trial on the basis of inconsistency in the verdicts. Since the status of the girl passengers was identical in all cases, there can be no reasonable explanation for returning a verdict in favor of the estate of the deceased Judith Long and refusing a verdict to her sister Joyce and her companion Mary Pascarella. Since the jury found that the parents of Joyce Long and Mary Pascarella were entitled to reimbursement for monies expended for medical bills incurred on account of injuries sustained by their daughters, there can be no reasonable explanation for denying a return to the girls themselves for those same injuries. Once a jury imposes legal liability on a responsible party they may not wilfully or capriciously withhold payment of an item which is inextricably interwoven in the pattern of the liability. In the case of *Bradwell v. Pittsb. Etc. Pass. Ry. Co.*, 139 Pa. 404, 413, the jury returned a verdict of 6¼ cents in favor of the plaintiff, although the evidence demonstrated he had sustained serious injuries and had suffered financial losses. In ordering a new trial this Court said: "In view of the uncontradicted evidence as to the serious nature of plaintiff's injuries, his actual outlay for surgical attendance, loss of earning power, etc., the verdict of six and one fourth cents in his favor was a mere travesty of justice that could not be condoned by the provisional order for a new trial which the plaintiff refused to accept. In finding for plaintiff, the jury must have reached the conclusion that his injuries were caused by the defendant company's negligence, and that he himself was not guilty of any negligence contributing thereto. Un-

der these circumstances, he was entitled, as matter of right, to have the jury pass fairly on the question of damages, and by their verdict award him such sum as, under the evidence, he was entitled to."

Also, in the case of *Todd v. Bercini*, 371 Pa. 605, 608, this Court said: "When it is apparent that a jury by its verdict holds the defendant responsible for a whole loaf of bread, it may not then neglectfully, indifferently, or capriciously cut off a portion of that loaf as it hands it to the plaintiff."

In his brief, plaintiffs' counsel complained that the lower Court erred in not permitting him to show in rebuttal that the Railway Company's physician had examined the injured minor plaintiffs but had not testified in court. For guidance of the Trial Court at the new trial, in the event the same situation should repeat itself, it is hereby declared that plaintiffs' counsel would have the right to show what he contended for. *Wilson et al. v. Consolidated Dressed Beef Co.*, 295 Pa. 168, 179, *Steel et al. v. Snyder et ux.*, 295 Pa. 120.

Only one more thing needs to be mentioned. The learned Trial Judge, in commenting on the testimony of a Dr. McCabe properly instructed the jury that they were not to be bound by any opinion he expressed, but then he went on to say: "but I was surprised—and I think that is an understatement—I was more than surprised when I heard a doctor who is a neurologist and a psychiatrist and a scientist say the things that were said by Dr. McCabe here in this court room in the presence of the two girls who were involved. He gave a very pessimistic—I won't say pessimistic, but unfavorable prognosis as to the future of these two girls. He said the injury sustained was something that was progressive, it would get worse from time to time, there was no cure for it, that nothing could be

done. It was about as hopeless a prospect as could be given to two young girls, who I am sure we all hope will have a better future than Dr. McCabe, if I understood him rightly, held out for them. What astonished me was that Dr. McCabe said those things in the presence of these two girls, nice girls, both of them, no doubt, because I think it is usual for a doctor when he has a mind to say anything of that kind about patients of his who might be seriously affected by it, to have them leave the court room while he is testifying. That was something about the testimony of Dr. McCabe that attracted my attention before he had proceeded very far. . . . At any rate I think it would be the fervent wish of all of us that these two girls have a very much brighter future than was set forth by the testimony of Dr. McCabe."

There is no rule which requires plaintiffs to leave the courtroom while their doctor is testifying. Nor does it enhance the appearance of scrupulous neutrality if a trial judge expresses amazement at a prognosis testified to under oath by a qualified physician. If a doctor's testimony is exaggerated, certainly opposing counsel will be as much aware of it as the judge and it devolves upon counsel, if he chooses to do so, to present appropriate evidence to contradict the doctor. But, once the defendant accepts without contradiction the medical evidence presented by the plaintiff, as was done here, the judge should not, consciously or unconsciously, minimize the effect of that evidence with expressions of astonishment which can only unduly affect the jury in its deliberations.

Proper evidence, so far as the Court is concerned, is neither optimistic nor pessimistic. It is intended to mirror fact and fact alone. If it distorts reality, the distortion should be exposed from the witness stand. It is not to be characterized by the trial judge who cer-

tainly has no greater access to the facts than the parties themselves.

It is, of course, commendable that a judge, with true human sympathies, should entertain a hope that a plaintiff may not be as bad off physically as a doctor indicates, but the judge may not offer those hopes in refutation to definitive, sworn testimony. It is indeed to the credit of a judge that he trusts the plaintiff is in better health than the evidence declares, but, in behalf of a salubrious impartiality, the better procedure is for the judge to leave medicine to the doctors and that, at least for the trial, he keep his impulses locked within his breast.

Order affirmed.