BECK, Judge.
 

 This is an appeal and cross-appeal from an order denying a motion for judgment notwithstanding the verdict, dismissing a defendant and granting a new trial in consolidated defamation actions.
 
 [2]
 
 The actions, originally brought by the now deceased James T. McDermott, former justice of the Supreme Court of Pennsylvania,
 
 [3]
 
 arose out of two publications, one in 1983 and one in 1984, by defendant, appellee-cross-appellant, Philadelphia Newspapers, Inc. (“PNI”). The issues raised on appeal are numerous and complex. They arise in the following factual and procedural context.
 

 I.
 
 FACTUAL BACKGROUND AND PROCEDURAL HISTORY
 

 On May 15, 16 and 17, 1983, PNI published a three installment series of articles in the Philadelphia Inquirer. The series, entitled “Above the Law” (“ATL I”), was authored by a PNI reporter, Daniel R. Biddle, who is also an appellee-crossappellant.
 
 [4]
 
 The series was the result of an eighteen month investigation into the workings of the Supreme Court of Pennsylvania. As the title of the article suggested, the investigation allegedly revealed a court that functioned as if it were above, instead of governed by, the law. The first article in the series, published on May 15, 1983, began -with the following indictment:
 

 
 *99
 
 Some justices routinely participate in cases in which their friends or associates have an interest.
 

 They routinely ignore judicial canons of ethics meant to regulate their conduct.
 

 They routinely engage in politicking, influence-peddling and favoritism and exhibit a head-in-the-sand attitude toward policing themselves and the rest of the state court system. Indeed, the court, which is charged with setting and enforcing standards not just for itself but for the state’s entire court system, does not adhere even to minimum standards governing conflict of interest.
 

 Both the May 15th and May 16th articles specifically discussed the conduct of Justice McDermott in an allegedly defamatory manner. The trial court has aptly summarized the allegedly defamatory aspects of these articles as follows:
 

 The May 15th article specifically discussed the involvement of Supreme Court Justice James T. McDermott in two cases before the Supreme Court, the “Coal Case” and the “Filbert Partnership Case” and his relationships with lawyers and law firms representing parties in those cases. The “Coal Case”, according to author Biddle, was an appeal to the Pennsylvania Supreme Court by the Department of Environmental Resources [“DER”] and some environmental groups from an order issued by the Commonwealth Court, at the request of Pennsylvania coal companies represented by the law firm of Dilworth Paxson. The Order directed the Commonwealth to wait a full year before seeking federal approval of new environmental regulations. DER and the environmental groups asked the Supreme Court for an immediate hearing on their appeal because of “an imminent danger of mine fires, water pollution and other hazards.” The coal industry opposed an expedited hearing. The article reported that the request for an expedited hearing was refused by the Supreme Court which held no hearing on the matter until more than a year later when the Court ruled that the issue had become moot. The defendant reported that in that year the Plaintiff [Justice McDermott] (among others) “received a total of $6,100 from Dilworth Paxson
 
 *100
 
 lawyers in his successful Supreme Court campaign” and that approximately three months before the hearing was finally held the Plaintiff went on a day long tour of the coal region of Schuylkill County accompanied by, and in a limousine “provided” by John Elliott, a Dilworth Paxson lawyer. The article also stated that John Elliott’s brother Thomas was one of four Dilworth Paxson lawyers handling the Coal Case before the Supreme Court. The article also included the Plaintiffs response to questions about his “role in the case”: “[McDermott] contended that his close friendship with lawyer John Elliott, his campaign funds from the Dilworth Paxson firm and his coal country limousine ride constituted no impropriety, nor even the appearance of impropriety.” The “Coal Case” portion of the article concluded with the remarks of a lawyer for one of the environmental groups who, upon learning of the campaign contributions made by the coal company’s attorney’s responded: “Incredible” ... “Talk about a conflict of interest. I mean, I’m a lawyer. Think of how it appears to clients. Three of the judges got thousands of campaign dollars from the people we’re against.”
 

 The “Filbert Partnership Case” concerned another case brought before the Supreme Court, the day following the “Coal Case” decision, by the Dilworth Paxson law firm. The Filbert Limited Partnership, represented by Harry Kalish, John Elliott and two other Dilworth Paxson lawyers, petitioned the Supreme Court to hear an appeal of the partnership’s suit against the City of Philadelphia. The partners “claimed that their building had, in effect, been condemned by the city’s plans to excavate a gaping hole” in front of the partner’s building for the construction of a center city commuter tunnel. The article stated that two lower courts had rejected the partner’s suit. While the Supreme Court denied the partnership’s petition, the article stated that Justice Nix wrote a report urging his colleagues on the Court to grant a hearing on the appeal and that Justice McDermott “by his own account supported Nix’s report.” Justice McDermott was reported to have agreed
 
 *101
 
 that the “combination of circumstances — the Elliott friendship, the limousine trip, and the campaign money — might make an opposing lawyer question McDermott’s impartiality.” This section of the article concluded with this quote from Justice McDermott “[y]ou have a point, that somebody could feel uncomfortable with that ... [b]ut there’s really no basis for it.”
 

 The second article, published on May 16, 1983, contained the following excerpts which Plaintiff claimed were defamatory of him:
 

 “In theory, the Court is bound by a document called the Code of Judicial Conduct which the Court itself enacted in 1973 and which has the force of law. But the Code is routinely ignored.
 

 The code says a judge ‘should not lend the prestige of his office to advance the private interests of others.’ Yet, repeatedly, judges do.”
 

 “Favoritism in hiring is not restricted to the Supreme Court’s own payrolls. Justices have also found jobs for friends, relatives and political allies elsewhere in the legal system.”
 

 The article then cited the following example:
 

 “Justice James T. McDermott acknowledges that in 1981 he asked Philadelphia District Attorney Edward G. Rendell to hire his son, James, Jr., ‘if there’s an opening.’ ”
 

 “There was, and in October of that year, the younger McDermott became an assistant district attorney — at a time when his father was a Philadelphia Common Pleas Court Judge one month away from being elected to the Supreme Court.”
 

 “Rendell’s office has cases on appeal to the Supreme Court almost constantly, and McDermott had also heard numerous cases from Rendell’s Office while a Common Pleas Court Judge.”
 

 
 *102
 
 “McDermott said in a recent interview that his son was well-qualified for the job. ‘I don’t see why he should be denied just because he had the good fortune to be my son,’ McDermott said.”
 

 “With a smile, he added; ‘nepotism will never die.’ ”
 

 A photograph of the Plaintiff appeared after the foregoing excerpt and below the photograph the following caption appeared:
 

 “Justice James T. McDermott (above) helped his son get on the district attorney’s staff — even though the elder McDermott still sat on the Common Pleas Court. ‘Nepotism will never die,’ the Justice said.”
 

 These two articles, as well as that published on May 17, 1983, also addressed many other aspects of the manner in which the Supreme Court conducted its business, and commented on specific conduct by the other justices. The articles indicted the court for its lavish spending on its own facilities and on expense accounts for the justices who were never called upon to account for their spending practices. The articles also included a lengthy discussion of Justice Larsen’s conduct and of the investigation of the Judicial Inquiry and Review Board into his activities, of Chief Justice Nix’s conduct in connection with garnering support for his retention on the court in 1981, and of these and other justices’ conduct in connection with the employment of friends, relatives and supporters.
 

 Justice McDermott brought suit based upon the allegedly defamatory content of these two articles in June 1983. The defendants named in this action were Philadelphia Newspapers, Inc., Daniel R. Biddle, Knight-Ridder Newspapers, Inc., which was the parent company of PNI, and two other employees of PNI.
 

 Several months after the filing of the first suit, PNI produced a reprint of the ATL I series in tabloid form (“ATL II”). The tabloid reprint included an exact copy of the three articles in the original series, ATL I, and also contained an editorial and two cartoons that had been printed in the
 
 *103
 
 Inquirer around the same time that the series had appeared. Although the subject of both the editorial and the cartoons was the Supreme Court, neither made specific mention of or reference to Justice McDermott. Lastly, the tabloid was prefaced by an introduction consisting of eleven brief paragraphs, none of which made specific reference to Justice McDermott.
 

 ATL II was forwarded to the American Judicature Society (“AJS”) and was made available to all who attended the annual meeting of the AJS at the 1984 Mid-Year Convention of the American Bar Association. ATL II was also sent to journalism schools and newspapers around the country.
 

 Justice McDermott brought suit based on the allegedly defamatory content of ATL II in March 1984. The defendants in the second suit included all the defendants in the first suit, with the addition of three other employees of PNI, including Eugene Roberts, an editor of the Inquirer. On October 10, 1989, the two actions were consolidated and trial was conducted from mid-October through early December, 1990. The trial was specially presided over by the Honorable John P. Lavelle. At the close of plaintiffs evidence, defendant Knight-Ridder’s motion for nonsuit was granted.
 
 [5]
 
 Ultimately the jury returned a verdict for defendants in the first action, based on ATL I, and a verdict for plaintiff in the second action, based on ATL II. The second verdict awarded plaintiff $3,000,000 in compensatory damages and $3,000,000 in punitive damages.
 

 The jury had been given special interrogatories to answer in arriving at its verdicts. The jury’s answers reveal that the reason the jury found liability in the second action but not in the first was that the jury concluded that ATL II, the tabloid reprint, was false but that ATL I, the original article, was not. The jury also found that PNI acted with actual malice.
 

 
 *104
 
 Voluminous post-trial motions were filed by both sides. In an order entered February 17, 1993, accompanied by a 31-page opinion, the trial court denied PNI’s motions for judgment notwithstanding the verdict, but granted a new trial in both actions based on the apparent inconsistency in the verdicts. This timely appeal followed.
 

 II.
 
 ISSUES ON APPEAL
 

 The following issues, as stated by the parties, are presented for our review:
 

 A.
 
 Issues Raised By Plaintiffs-Appellants-Cross-Appellees (the McDermotts).
 

 1. Did the trial court commit reversible error in awarding new trials on the grounds that the verdicts in two separate, independent cases were inconsistent?
 

 2. Did the trial court err in ruling post-trial that PNI’s publications were not actionable insofar as they concerned the Coal Case and the Filbert Partnership Case, because those stories were limited to statements of opinion and lacked any “verifiable faets”?
 

 3. Did the trial court err in entering a compulsory nonsuit on the claims against Knight-Ridder?
 

 B.
 
 Issues Raised By Defendants-Appellees-Cross-Appellants (PNI).
 

 1. Should judgment N.O.V. be entered in favor of of the defendants: (a) where the plaintiff prevented himself from meeting his burden of proving that the articles as published were defamatory by offering in evidence versions of the articles that he had drastically edited; and (b) where the constitutionally required independent appellate review of the record compels the conclusion that the plaintiff did not meet his burden of proving actual malice by clear and convincing evidence?
 

 III.
 
 JUDGMENT NOTWITHSTANDING THE VERDICT
 

 We begin our examination of the issues presented with PNI’s arguments in support of judgment n.o.v.. The standard
 
 *105
 
 of review generally applicable to a review of a denial of judgment n.o.v. has recently been reiterated by the Supreme Court as follows:
 

 In reviewing a motion for judgment n.o.v., “the evidence must be considered in the light most favorable to the verdict winner, and he must be given the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor.”
 
 Broxie v. Household Finance Company,
 
 472 Pa. 373, 380, 372 A.2d 741, 745 (1977).
 
 See also, Metts v. Griglak,
 
 438 Pa. 392, 264 A.2d 684 (1970) and
 
 Gonzalez v. United States Steel Corp.,
 
 484 Pa. 277, 398 A.2d 1378 (1979). Moreover, [a] judgment n.o.v. should only be entered in a clear case and any doubts must be resolved in favor of the verdict winner.
 
 See Atkins v. Urban Redevelopment Authority of Pittsburgh,
 
 489 Pa. 344, 414 A.2d 100 (1980) and
 
 Stewart v. Chernicky,
 
 439 Pa. 43, 266 A.2d 259 (1970).
 

 Moure v. Raeuchle,
 
 529 Pa. 394, 402, 604 A.2d 1003, 1007 (1992).
 

 PNI asserts two bases for entry of judgment n.o.v. in its favor. Although the precise meaning of PNI’s first argument is not readily apparent, we construe the argument to be that although the McDermotts succeeded in convincing the jury that ATL II conveyed a defamatory meaning, they failed to do so in the manner that the law requires. PNI contends that the McDermotts persuaded the trial court to commit legal error when they persuaded the court to submit to the jury only those portions of ATL II relating to Justice McDermott instead of the entire article. PNI urges us to find that as a result of this error, the jury’s finding of defamatory meaning was fatally flawed because it was based on a review of only portions of the article, whereas the law requires that defamatory meaning be found only after a review of the entire publication so that the allegedly defamatory portions can be analyzed in context. If the entire publication had been presented to the jury, PNI hypothesizes, the McDermotts would never have been able to prove defamatory meaning. PNI
 
 *106
 
 concludes that the proper remedy for this alleged error is a grant of judgment n.o.v.
 

 PNI is on firm ground in stating that the Supreme Court of Pennsylvania has opined that defamatory meaning should be assessed in the context of the entire article at issue.
 
 See, e.g., Thomas Merton Center v. Rockwell International Corp.,
 
 497 Pa. 460, 442 A.2d 213 (1981),
 
 cert. denied,
 
 457 U.S. 1134, 102 5. Ct. 2961, 73 L.Ed.2d 1351 (1982).
 
 [6]
 
 Whether this is a
 
 sine qua non
 
 requirement in every defamation action is not before us. In fact, we find it unnecessary to decide whether the trial court committed legal error in refusing to submit the entire publication to the jury in this case.
 

 Rather, we reject PNI’s argument on the alternate ground that even if we were to find error, that error is not of the type that would warrant judgment n.o.v. but is the type of error that would properly be remedied by the grant of a new trial. The error implicates only the admission of evidence. PNI’s attempt to phrase this argument as an allegation that the McDermotts failed to prove defamatory meaning as a matter of law, thereby entitling PNI to judgment n.o.v., lack merits. The gravamen of the argument is that the McDermotts
 
 did
 
 prove defamatory meaning but only by persuading the trial court to submit a severely redacted version of the publication to the jury, thereby violating the legal requirement that the jury assess defamatory meaning in context. Properly construed and categorized PNI’s argumént is simply that the trial court erred in refusing into evidence certain portions of the publication at issue. Errors in decisions regarding the admission of evidence are properly cured by the grant of a new trial where the improperly excluded evidence is admitted for consideration by a new jury.
 
 Stewart v. Chernicky,
 
 439 Pa. 43, 54 n. 11, 266 A.2d 259 (1970) (“[a] judgment n.o.v. does not lie for the correction of errors in the admission or exclu
 
 *107
 
 sion of evidence, which errors may properly be the subject of a motion for a new trial”) Therefore, there is no merit to this argument as a ground for judgment for PNI as a matter of law.
 

 Although we could now proceed to determine whether the trial court erred in refusing to submit the entire publication so as to require a new trial, we will refrain from doing so. As a later portion of this opinion reveals, we have determined that a new trial of both actions is required in any event because of the inconsistency in the jury’s verdicts. Given this decision, we deem it advisable to permit the trial court on retrial to consider anew the question of whether all or only portions of the publications should be submitted to the jury. It is the trial court that should be permitted to regulate the admission of evidence in the new trial, in accordance with both the law and the trial court’s sound discretion, exercised in the context of the circumstances presented at the time of the new trial.
 
 See Chiaverini v. Sewickley Valley Hosp.,
 
 409 Pa.Super. 630, 598 A.2d 1021, 1024 n. 3 (1991) (once appellate court determined new trial was required on one asserted ground, other grounds for new trial based on allegedly erroneous evidentiary rulings need not be decided).
 

 PNI also argues that it is entitled to judgment n.o.v. on the ground that the McDermotts failed to sustain their heavy burden of proving actual malice by clear and convincing evidence. However, PNI limits this argument strictly to the articles’ statements concerning Justice McDermott’s involvement in his son’s employment by the District Attorney’s office and nepotism. PNI urges us to find that the evidence of actual malice with regard to Justice McDermott’s alleged involvement in the District Attorney’s hiring of his son was so self-contradictory as to entitle PNI to judgment n.o.v. PNI further argues that there was insufficient evidence of actual malice regarding PNI’s allegedly inaccurate attribution to “a smiling” Justice McDermott of the statement “Nepotism will never die.”
 

 The requirement of clear and convincing evidence of actual malice in a public official or public figure defamation action as
 
 *108
 
 a constitutionally mandated prerequisite to liability was first enunciated in
 
 New York Times Co. v. Sullivan,
 
 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).
 
 See also Curtis Publishing Co. v. Butts,
 
 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). There, the Court defined “actual malice” as “knowledge that it [the statement] was false or ... reckless disregard of whether it was false or not.”
 
 Id.,
 
 376 U.S. at 279-80, 84 S.Ct. at 725-26. The meaning of “reckless disregard” was further explained in
 
 St. Amant v. Thompson,
 
 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), where the Court stated:
 

 ____ reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard to the truth or falsity which demonstrates actual malice.
 

 Id.
 
 at 731, 88 S.Ct. at 1325.
 

 The courts of this Commonwealth have expounded upon the type and quantum of evidence required to support a finding of actual malice. In
 
 Curran v. Philadelphia Newspapers, Inc.,
 
 376 Pa.Super. 508, 546 A.2d 639 (1988),
 
 appeal denied,
 
 522 Pa. 576, 559 A.2d 37 (1989), a panel of this court deemed it appropriate for a jury to consider whether the allegedly defamatory statement was published in the face of verifiable denials or without further investigation despite the seriousness of the allegations in the statement.
 
 Id.
 
 at 512-13, 546 A.2d at 642. The
 
 Curran
 
 court also noted that evidence of unexplained distortion or the absence of any factual basis to support the statement would be indicative of actual malice.
 
 Id.
 
 (citing
 
 Frisk v. News Company,
 
 361 Pa.Super. 536, 523 A.2d 347 (1986)). Finally, the court emphasized that neither evidence of falsity alone or of ill will or a desire to do harm to the plaintiff were sufficient to establish malice.
 
 Id.
 

 PNI stresses the heavy constitutional responsibility of a reviewing court in determining whether a jury’s finding of actual malice is supported by clear and convincing evidence.
 
 *109
 
 PNI argues that this responsibility goes beyond the normal standard of review which we have set forth above and requires that we perform an independent review of all of the evidence underlying the jury’s finding of actual malice.
 

 The Supreme Court of the United States has in recent years provided a detailed explanation of our function in reviewing a finding of actual malice. In
 
 Harte-Hanks, Inc. v. Connaughton,
 
 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989), the Court addressed the issue of “[wjhether, in a defamation action instituted by a candidate for public office [i.e. a public figure], the First & Fourteenth Amendments obligate an appellate court to conduct an independent review of the entire factual basis for a jury’s finding of actual malice — a review that examines both the subsidiary facts underlying the jury’s finding of actual malice and the jury’s ultimate finding of actual malice itself.”
 
 Id.
 
 at 697, 109 S.Ct. at 2700, 105 L.Ed.2d at 594 (Scalia, J., concurring). The court answered this question as follows:
 

 In determining whether the constitutional standard has been satisfied, the reviewing court must consider the factual record in full. Although credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the ‘opportunity to observe the demean- or of the witnesses,’
 
 Bose [Corp. v. Consumers Union of U.S., Inc.],
 
 466 US [485] at 499-500, 80 LEd2d 502, 104 S Ct 1949 [1959 (1984) ], the reviewing court must “ ‘examine for [itself] the statements in issue and the circumstances under which they were made to see ... whether they are of a character which the principles of the First Amendment ... protect,’ ”
 
 New York Times Co. [v. Sullivan],
 
 376 US [254], at 285, 11 LEd2d 686, 84 SCt 710 [728-29 (1964)], 95 ALR2d 1412 (quoting
 
 Pennekamp v. Florida,
 
 328 US 331, 335, 90 LEd 1295, 66 SCt 1029 [1031] (1946)).
 

 Id.
 
 at 688-89, 109 S.Ct. at 2696, 105 L.Ed.2d at 589.
 

 Thus, the reviewing court is called upon to review all the relevant evidence, and must evaluate the findings of underlying fact that led the jury to the ultimate conclusion that the defendant acted with actual malice. In reviewing
 
 *110
 
 findings of underlying fact, the reviewing court does not exercise its own independent judgment.
 
 Id.
 
 at 688-89, 109 S.Ct. at 2696, 105 L.Ed.2d at
 
 589; id.
 
 at 697-98, 109 S.Ct. at 2700-01, 105 L.Ed.2d at 595 (Scalia, J., concurring). Rather, as the Court had previously stated in
 
 Bose Corp. v. Consumers Union of United States, Inc.,
 
 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), the reviewing court must ascertain whether the jury’s conclusion is “clearly erroneous” and may only so conclude “when although there is evidence to support it, the reviewing court,
 
 on the entire evidence
 
 is left with the definite and firm conviction that a mistake has been committed.”
 
 Id.
 
 at 500, 104 S.Ct. at 1959. (emphasis in original).
 
 See also Curran,
 
 376 Pa.Super. at 520, 546 A.2d at 646.
 

 After careful consideration of the Supreme Court’s admonitions regarding our heavy constitutional responsibility in reviewing a jury finding of actual malice, we have concluded that given the state of the record before us, and in light of the very limited nature of the actual malice issue as presented by PNI, we cannot conduct the necessary review of the jury’s actual malice determination.
 

 As previously noted, PNI requests judgment n.o.v. on the actual malice ground
 
 only
 
 in relation to the articles’ allegedly defamatory attribution to Justice McDermott of the statement “Nepotism will never die,” and insofar as the articles addressed Justice McDermott’s involvement in the hiring of his son by the District Attorney. However, we cannot determine from the record before us whether the jury in fact found actual malice in connection with the publication of these specific portions of the articles.
 

 This case was tried to the jury on the basis of three alleged instances of defamation — those relating to nepotism and the hiring of Justice McDermott’s son, those relating to the Coal Case, and those relating to the Filbert Partnership Case. The interrogatories posed to the jury asked it to determine separately whether the Coal and Filbert Partnership Case aspects of the articles were false and whether the nepotism and hiring aspects of the articles were false. In the action based on ATL
 
 *111
 
 II, the jury responded “Yes” to both questions and found falsity as to all of the defamatory aspects of the articles. However, the interrogatory concerning actual malice was not so carefully phrased. It merely asked:
 

 Do you find that Plaintiff, Justice McDermott, has established, by clear and convincing evidence, that any or all of the portions of the articles, “Above the Law,” relating to Justice McDermott were published with knowledge of falsity or a reckless disregard for truth or falsity?
 

 The jury answered “Yes” to this interrogatory. Obviously, however, the jury’s answer does not reveal whether the jury found actual malice in connection with the Coal Case aspects of the articles, the Filbert Partnership Case aspects of the articles, or the nepotism and hiring aspects of the articles. In consequence, we have no idea what underlying facts the jury found in arriving at their ultimate conclusion that PNI acted with actual malice. The jury’s finding of actual malice may well have been based exclusively on aspects of the articles having nothing to do with nepotism or the hiring of Justice McDermott’s son.
 

 The Supreme Court has made it' eminently clear that we have a constitutional duty to review findings of underlying fact supporting a jury’s ultimate finding of actual malice on the basis of all the evidence. We are required to do so in order to determine if the jury correctly concluded that there was clear and convincing evidence of actual malice, thus removing the constitution’s protection from the statements at issue.
 
 See Harte-Hanks, supra.
 
 On the basis of the record before us today, we cannot ascertain what underlying facts the jury may have found as a prelude to concluding that PNI acted with actual malice. Therefore, we cannot perform the review that the Supreme Court and the Constitution require of us. Any such review in this case would necessarily be based on pure speculation as to what the jury actually found. Certainly under these circumstances we cannot render a decision granting PNI judgment n.o.v. on this issue.
 

 
 *112
 
 IV. .
 
 NEW TRIAL
 

 The McDermotts assert several grounds for reversal of the trial court’s order granting a new trial based on the inconsistency of the verdicts. In considering these allegations of error, we employ the following standard of review:
 

 “It is a fundamental and longstanding precept that the decision to order a new trial is one that lies within the discretion of the trial court.
 
 E.g. Spang & Co. v. United States Steel Corp.,
 
 519 Pa. 14, 24, 545 A.2d 861, 865 (1988);
 
 Colosimo v. Pennsylvania Electric Co.,
 
 513 Pa. 155, 163, 518 A.2d 1206, 1210 (1986);
 
 Smyth v. Philadelphia & West Chester Traction Co.,
 
 263 Pa. 511, 516, 107 A. 20, 21 (1919). This means that the trial court has considerable latitude within which to act, but there are also very specific limits to what it can do.
 

 The term ‘discretion’ imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, and discretionary power can only exist within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge.... Discretion is abused when the course pursued represents not merely an error of judgement, but where the judgement is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.
 

 P.L.E. New Trial § 2. One way of summing up all the qualities described in this definition of a valid exercise of discretionary power is to say that the decision had merit. Conversely, if the reason for performing a discretionary act had no merit, then the trial court abused its discretion. Thus, when viewed in terms of the degree of scrutiny that should be applied, an inquiry into an abuse' of discretion is operationally equivalent as one into the merit of the trial court’s decision.”
 

 Coker v. S.M. Flickinger Co., Inc.,
 
 533 Pa. 441, 447-48, 625 A.2d 1181, 1184-85 (1993). If the trial court indicates that the reasons it gives for granting a new trial are the only basis for that decision, this Court can only examine those
 
 *113
 
 reasons.
 
 Id.
 
 at 448-49, 625 A.2d at 1185. In that situation, “circumstances may still demand a review of the entire record. However, the purpose for doing so is not to locate a valid reason for affirming the order. The inquiry is strictly directed at determining whether the trial court’s stated reasons and factual basis can be supported.”
 
 Id.
 
 at 452, 625 A.2d at 1187.
 

 Lupkin v. Sternick,
 
 431 Pa.Super. 300, 636 A.2d 661, 662 (1994).
 

 Since in this case the trial court specified only one reason for granting a new trial, i.e., that the jury’s verdicts were fatally inconsistent, we will examine the merits of that reason alone.
 

 The McDermotts begin by arguing that the grant of a new trial was in error because PNI waived the right to a new trial on the basis of inconsistent verdicts. They argue that PNI failed properly to raise this issue at two points in the trial. They contend that the first instance of waiver occurred when PNI did not object to the trial court’s instruction to the jury that the matter before it involved “two separate and distinct libel or defamation cases.” The McDermotts appear to argue that it is waiver if a party fails specifically to request that the trial court instruct a jury deciding consolidated cases that its verdicts must be consistent.
 

 The McDermotts cite no case law in support of this novel waiver principle and we have found none. There is nothing in the law of Pennsylvania to support the proposition that a party is obligated to anticipate every false move a jury could possibly make in its deliberations and request instructions seeking to avoid such problems in advance of the jury’s deliberations. Nor do we agree with the McDermotts’ contention that in this case PNI should have objected to the trial court’s preliminary statement which simply reminded the jury that the matter before them involved two consolidated cases. The trial court’s reminder to the jury did not signal that the jury might return inconsistent verdicts and gave rise to no valid ground for objection by PNI. It would clearly be an unwarranted expan
 
 *114
 
 sion of the waiver doctrine if we were to accept the McDermotts’ argument, and would impose a burden on trial counsel which we doubt the McDermotts themselves would wish to sustain.
 

 The McDermotts further argues that PNI did not preserve their objection to the inconsistent verdicts after they were returned. The McDermotts rely on the recent decision of the Supreme Court in
 
 Williams v. Southeastern Pennsylvania Transportation Authority,
 
 534 Pa. 467, 633 A.2d 1090 (1993). In
 
 Williams,
 
 the court considered whether plaintiff had waived her objections to the inconsistent verdict rendered in her personal injury action; first, by failing to object to the form of the interrogatories posed to the jury and, second, by objecting to the inconsistency in the verdict for the first time in post trial motions rather than when the verdict was returned. The court summarily dismissed the first contention, finding that plaintiff had no duty to object to the form of jury interrogatories since they did not actually ask the jury to render an inconsistent verdict.
 
 [7]
 

 Id.
 
 at 477, 633 A.2d at 1095. However, the court found, that plaintiff had waived her objection to the inconsistent verdict by failing to say anything about it when the verdict was returned and waiting instead to raise the issue in post-trial motions.
 
 Id.
 
 at 477, 633 A.2d at 1095.
 

 In the case before us, the course of events was materially different from those presented in
 
 Williams.
 
 Here, upon hearing the jury’s verdicts, and before the jury was permitted to leave, counsel for PNI requested a sidebar conference with the trial judge and the following conversation transpired:
 

 Counsel for appellees: Since the verdicts are obviously inconsistent, we will be moving either for a mistrial or Judgment NOV. I wanted to make clear that I’m not waiving that by moving after the jury has left; is that correct?
 

 
 *115
 
 The Court: No, you don’t have to waive that. You have that right "within ten days after a verdict is entered.
 

 Counsel for appellees: Okay.
 

 The Court: That is the verdict that has been entered now. You have your ten days to make whatever Motions you want to make.
 

 Given this exchange, it would be inequitable to hold that PNI had waived their right to object to the inconsistent verdict. They did everything that could have been done to avoid such a waiver and were advised by the court itself that the appropriate time for seeking redress for the inconsistent verdicts was in post-trial motions. Nothing in the
 
 Williams
 
 opinion requires us to reach such an inequitable result.
 

 Nor does this Court’s even more recent decision in
 
 Curran v. Greate Bay Hotel & Casino,
 
 434 Pa.Super. 368, 643 A.2d 687 (1994), command a contrary result.
 
 [8]
 
 There, the court held that a party must object to an inconsistent verdict before the jury is discharged so that an attempt to cure the defect in the verdict can be made.
 
 Id.,
 
 434 Pa.Super. at 374, 643 A.2d at 690. In the instant case, counsel did object to the inconsistent verdicts before the jury was permitted to leave. When the trial court stated that he was going to discharge the jury, counsel for PNI immediately requested a sidebar conference to make his objection to the verdicts and to make sure that he was not waiving the issue by agreeing to allow the jury to leave. The trial court then informed counsel that the proper time for objecting was in post-trial motions. The fact that there was no attempt to cure the inconsistency was clearly not the fault of counsel, but rather resulted from the trial court’s decision to deal with the inconsistency issue post-trial.
 

 
 *116
 
 We now turn to a consideration of the substantive arguments made by the McDermotts in favor of reversing the trial court’s grant of a new trial based on the inconsistent verdicts. They are that inconsistent verdicts are permissible as a matter of law when they are rendered in separate and distinct causes of action, that the instant verdicts are reasonably explicable and not really inconsistent, and finally that any inconsistency between the verdicts can be reconciled simply by holding that the verdict for PNI based on ATL I is against the weight of the evidence.
 

 Our analysis of these issues requires us first to examine in greater detail the differences between the two publications involved in these actions so that we may determine if there is a reasonable explanation based on those differences for the jury’s finding of falsity as to ATL II but not as to ATL I. Although the jury considered allegations of defamation in two separate publications, ATL I and ATL II, the text of the two publications was essentially identical, as the second was largely a reprint of the first. However, ATL II was not only a reprint, but also contained certain additional material. This material consisted of two cartoons, an editorial piece and a brief introduction. None of these materials made any specific mention of Justice McDermott or his conduct. One cartoon depicted the Supreme Court building as bearing the insignia “PASupreme Disgrace”, with two farcical statues standing in front. The other showed the Supreme Court building with a sewer in front from which is issuing the phrase “OYEZ, OYEZ, OYEZ.” The editorial was entitled “The poisoning of justice affects all Pennsylvanians.” Although the editorial was an undoubtedly negative commentary on the Supreme Court and reiterated in general terms the conclusions drawn in ATL I, it contained no new information concerning the court and no specific reference to Justice McDermott. Similarly, the introduction contained no new information, no specific reference to Justice McDermott and focussed on specific allegations aimed at Justice Larsen.
 

 We agree with the trial court’s determination that no reasonable explanation for the disparity in the jury’s findings can
 
 *117
 
 be found based on these differences in the two publications. The trial court appropriately did not consider whether the jury could have found a separately false defamatory statement concerning Justice McDermott in the cartoons or the editorial, because the McDermotts had never contended that these portions of ATL II were separately false. The court had not submitted these two items to the jury for a determination of truth or falsity and had properly instructed the jury to consider the cartoons and the editorial
 
 only
 
 in connection with determining whether ATL II had defamatory meaning, and
 
 not
 
 in determining the separate question of whether ATL II was false. Therefore, the jury’s conflicting verdicts could not be explained on the basis of the falsity of statements in the cartoons or editorials.
 

 In its opinion the trial court did, however, carefully compare the precise language of the introduction to ATL I and the new introduction that accompanied ATL II to determine if any explanation for the jury’s verdicts might be found there. The introduction that appeared in ATL I was modified in ATL II. The court concluded:
 

 It is clear that the introduction to “ATL II” merely restates or reiterates (although in sometimes differing form or order) the allegations contained in the introduction to “ATL I”. They do not differ in content, substance or meaning from the charges contained in “ATL I”. We cannot find, by even a forced comparison, any new defamatory or false element introduced in these sentences which the jury could have found provably false. What the jury found was not provably false in the 1983 publication could not logically and consistently be found to have been proven false in the 1984 reprint. We, therefore, can discern no reasonable theory or conclusion for the jury’s inconsistent answers.
 

 We have engaged in a similarly close reading of the introduction to ATL I and ATL II and agree with the trial court that nothing contained therein could logically have led the jury to find falsity in ATL II where they did not find it in ATL I.
 

 
 *118
 
 On appeal, the McDermotts attempt to refocus our attention on the cartoons and editorial. They contend that there is a reasonable explanation for the verdicts, i.e., that there is no inconsistency warranting a new trial, because the jury must have found, on reading the editorial and viewing the cartoons, that PNI had intended to convey a defamatory meaning and that what they conveyed was false. In other words, the McDermotts appear to argue that the editorial and cartoons clarified for the jury what PNI was trying to convey and that, once clarified, the meaning revealed itself to be false.
 

 In light of the jury’s response to interrogatories, we cannot accept McDermotts’ explanation for the jury’s actions in this case. The special interrogatories posed to the jury in each action specifically asked the jury whether each publication was defamatory and the jury answered “yes” in both actions. Clearly they understood both “ATL I” and “ATL II” as being defamatory of Justice McDermott and their inconsistent conclusion that the first alleged defamation was not false, whereas the second alleged defamation was, simply cannot be explained.
 

 Therefore, we must proceed to consider whether the inconsistency between the verdicts is legally impermissible. Although the law regarding inconsistent verdicts in civil cases is itself not entirely consistent, nevertheless it is clear that where “a verdict is inconsistent ..., and is unacceptable for such reason[s], the proper procedure is to strike it and grant a new trial.”
 
 Interstate Creamery, Inc. v. Reinerth,
 
 212 Pa.Super. 335, 339, 243 A.2d 451, 453 (1968). However, the McDermotts argue that Pennsylvania case law prohibits inconsistent verdicts only when the inconsistency arises within a verdict in a single cause of action, and not where it exists between verdicts entered in separate causes of action. The McDermotts primarily rely on two cases,
 
 Gould v. Nickel,
 
 268 Pa.Super. 183, 407 A.2d 891 (1979),
 
 appeal dismissed,
 
 501 Pa. 336, 461 A.2d 765 (1980), and
 
 Burgan v. City of Pittsburgh,
 
 115 Pa.Commw. 566, 542 A.2d 583 (1988),
 
 appeal denied,
 
 521 Pa. 613, 557 A.2d 344 (1989). PNI, on the other hand, refers us to higher authority, earlier Pennsylvania Supreme Court
 
 *119
 
 cases, to support the proposition that a new trial is equally warranted where inexplicably inconsistent verdicts are entered by the same jury in separate causes of action. These cases include
 
 Gross v. Lockwood Folding Box Corp.,
 
 443 Pa. 159, 277 A.2d 359 (1971) (per curiam);
 
 Perkon v. Marnella,
 
 392 Pa. 319, 140 A.2d 799 (1958); and
 
 Pascarella v. Pittsburgh R. Co.,
 
 389 Pa. 8, 131 A.2d 445 (1957).
 

 We have carefully examined the apparently conflicting holdings of these several cases and have concluded that the proper construction of the law requires that we order a new trial because under the circumstances of this case the verdicts are impermissibly inconsistent.
 

 The cases relied upon by PNI clearly stand for the proposition that there are circumstances in which separate causes of action are tried together and result in verdicts that are so inconsistent
 
 inter se
 
 that a new trial is warranted. For example, in
 
 Pascarella v. Pittsburgh R. Co.,
 
 389 Pa. 8, 131 A.2d 445 (1957), three young women were riding in a vehicle that was struck by a trolley car. One of the women was killed and the others were injured. All of the victims’ actions against the trolley company and the driver of the car were tried together before the same jury, which returned verdicts for the estate of the deceased victim, but against the two injured victims. The Supreme Court said:
 

 Since the status of the girl passengers was identical in all cases, there can be no reasonable explanation for returning a verdict in favor of the estate of the deceased Judith Long and refusing a verdict to her sister Joyce and her companion Mary Pascarella [the injured victims].
 

 Id.
 
 at 13, 131 A.2d at 447. The court then ordered a new trial. Similar situations were presented in both
 
 Gross v. Lockwood Folding Box Corp., supra,
 
 and
 
 Perkon v. Marnella, supra,
 
 and resulted again in findings of impermissible inconsistency in the verdicts and grants of a new trial.
 

 These cases clearly indicate that under Supreme Court precedent inconsistent verdicts in separate actions, which could have been but were not separately tried, are
 
 *120
 
 impermissible. The complicating factor arises in construing the cases cited by the McDermotts, particularly
 
 Gould v. Nickel,
 
 in light of this Supreme Court precedent.
 

 In
 
 Gould,
 
 the parents of an injured minor brought an action in trespass in which they asserted both their own cause of action and a cause of action on behalf of their minor son. The jury returned a verdict for the parents, but assessed no damages to the minor. The parents appealed on behalf of their minor son only.
 
 Gould,
 
 268 Pa.Super. at 183-84, 407 A.2d at 891-92. The
 
 Gould
 
 court stated the issue as being whether the verdict was inconsistent because the claim of the parents was “derivative” of that of the son. The court rejected this argument, finding that the parents’ claim was not derivative. The court then proceeded to analyze whether there was an inconsistency within the verdict returned in the minor’s cause of action and found none. The court explained that the verdict against the minor might well be attributed to the jury having found the minor contributorily negligent, whereas no instruction had been given regarding contributory negligence as to the parents. In consequence, the court, refused to order a new trial in the minor’s action.
 
 Id.
 
 at 186-87, 407 A.2d at 893.
 

 In the course of discussing the issue posed, the
 
 Gould
 
 court stated that “[i]t ... appears that any inconsistency in a verdict or verdicts must be in each independent action and not between verdicts in separate and distinct actions.”
 
 Id.
 
 at 186, 407 A.2d at 892. It is this language on which the McDermotts rely in arguing that any inconsistency between the verdicts in the instant case is permissible.
 

 In contrast to the instant case, the
 
 Gould
 
 court did not find the verdicts inconsistent. Therefore, statements relating to inconsistent verdicts represent dicta and not holding. Even if this were not so we would not view the
 
 Gould
 
 language as a binding statement of law which would have the effect of overturning
 
 sub silewtio
 
 the clear precedent of the
 
 Pascarella
 
 line of cases.
 
 Pascarella’s
 
 precedent is derived from the Supreme Court while
 
 Gould
 
 represents the view of the intermediate appellate body, the Superior Court. Furthermore,
 
 *121
 
 the
 
 Gould
 
 language appears in the midst of a discussion of verdicts which, as we have noted, the
 
 Gould
 
 court ultimately found not to be inconsistent at all. The
 
 Gould
 
 court was able to explain the disparity in the verdicts by pointing to a relevant difference in the jury instructions given as to each cause of action. Thus, the court actually found no inconsistency either within the minor’s action or as between the parents’ and the minor’s action and its statement regarding the law that would apply if the verdicts were inconsistent cannot be relied upon in this case.
 
 [9]
 

 Finally, we deal summarily with the McDermotts’ argument that if we do conclude that the jury’s verdicts were impermissibly inconsistent, then the proper remedy is to declare one but not the other against the weight of the evidence. Obviously the McDermotts seek that we declare the verdict against them to be against the weight of the evidence while preserving the verdict in which the jury awarded them $6 million dollars.
 

 Pennsylvania law is clear — where a jury has reached an inconsistent verdict in a civil case the proper remedy is a new trial.
 
 See Pascarella, supra; Interstate Creamery, supra.
 
 The McDermotts cite us to no case in which it has been held that the proper remedy is to choose between the inconsistent verdicts. Although the McDermotts refer us to
 
 Thompson v. City of Philadelphia,
 
 507 Pa. 592, 493 A.2d 669 (1985), we find nothing in that decision to support his position. In
 
 Thompson,
 
 the jury returned a verdict which the trial court found to be against the weight of the evidence insofar as it apportioned liability among the parties and, therefore, the trial court ordered a new trial on apportionment. Presumably a new trial as to apportionment only was ordered because all parties had settled as to all other issues prior to the appeal.
 
 *122
 
 The Supreme Court affirmed. Nothing in the the case raised the issue of inconsistent verdicts or the proper remedy therefor.
 

 In fact, insofar as
 
 Thompson
 
 can be viewed as relevant to this case at all it may well be read to weigh in against the McDermotts since it reiterates the well established principle that the proper remedy for a verdict that is against the weight of the evidence is a new trial, which is of course exactly what the trial court has ordered here.
 
 See also First National Bank v. Turchetta,
 
 407 Pa. 511, 181 A.2d 285 (1962). The remedy is not to set aside the verdict, as the McDermotts would have us do.
 

 The verdicts returned in this case cannot reasonably be explained. It is eminently clear that the jury went seriously wrong in its decision-making process and a new trial must be had.
 

 V.
 
 DISMISSAL OF KNIGHT-RIDDER, INC.
 

 The McDermotts also challenge the trial court’s grant of a compulsory nonsuit in favor of Knight-Ridder, Inc., the parent company of PNI. A compulsory nonsuit should be entered where the plaintiff “has not introduced evidence sufficient to establish the necessary elements to maintain an action.”
 
 Hatbob v. Brown,
 
 394 Pa.Super. 234, 237, 575 A.2d 607, 608 (1990). Although in the trial court the McDermotts primarily argued that the liability of Knight-Ridder should be premised on piercing the corporate veil of PNI, they have abandoned this argument on appeal. In this court, they argue that Knight — Ridder is vicariously liable for the acts of Eugene Roberts, the Executive Editor of the Philadelphia Inquirer at the time of the publication of ATL I and ATL II. Roberts was also an originally named defendant in the second action, based on ATL II, but not in the first action, based on ATL I. The McDermotts contend that Knight-Ridder’s vicarious liability arises from the fact that Roberts acted as the “joint agent” of both Knight-Ridder and PNI in fulfilling his editorial duties at the time of the two publications. The McDermotts
 
 *123
 
 do not argue that Knight-Ridder is directly liable for any defamatory act.
 

 We affirm the trial court’s dismissal of Knight-Ridder from these consolidated actions on two independent grounds. First, we agree with PNI that since in the second action the trial court granted a nonsuit in favor of Roberts, KnightRidder’s alleged agent, and since this grant of nonsuit as to Roberts was never appealed and is now res judicata, any finding of liability as to Knight-Ridder in the second action has now been foreclosed as a matter of law.
 

 In
 
 Mamalis v. Atlas Van Lines, Inc.,
 
 522 Pa. 214, 560 A.2d 1380 (1989), the Supreme Court stated the following clear proposition of law:
 

 We hold that absent any showing of an affirmative act, or failure to act when required to do so, by the principal, termination of the claim against the agent extinguishes the derivative claim against the principal. A claim of vicarious liability is inseparable from the claim against the agent since any cause of action is based on the acts of only one tortfeasor.
 

 Id.
 
 at 221, 560 A.2d at 1383. Applying this proposition to the instant case, we find that Roberts, the purported agent of Knight-Ridder, was granted a compulsory nonsuit by order dated November 23,1990. The same order granted a compulsory nonsuit in favor of Knight-Ridder. The names of these defendants were not, therefore, submitted to the jury. The McDermotts did not appeal the dismissal of Roberts from that action and the trial court’s finding that the evidence was insufficient as a matter of law to prove that Roberts was liable for defamation is now res judicata. Thus, under the above-quoted language from
 
 Mamalis,
 
 it is clear that Knight-Ridder cannot be held vicariously liable for Roberts’ actions.
 

 However, the foregoing rationale applies only in the second action, based on ATL II, since Roberts was never a defendant in the first action, based on ATL I. Nevertheless, we affirm the nonsuit of the claims against Knight-Ridder in the first action on the ground that the McDermotts failed to
 
 *124
 
 sustain their burden of proving that Roberts was acting as Knight-Ridder’s agent in publishing ATL I. As a matter of law, the evidence of record simply does not demonstrate that Roberts was acting as Knight-Ridder’s agent in connection with the publication of ATL I. The pivotal inquiry in determining whether Roberts was Knight-Ridder’s agent is whether Roberts was acting under Knight-Ridder’s control in publishing ATL I.
 
 Strain v. Ferroni,
 
 405 Pa.Super. 349, 360, 592 A.2d 698, 704 (1991). The burden of proving that Roberts was Knight-Ridder’s, as well as PNI’s, agent was on appellants.
 
 Bolus v. United Penn Bank,
 
 363 Pa.Super. 247, 525 A.2d 1215, 1221 (1987),
 
 appeal denied,
 
 518 Pa. 627, 541 A.2d 1138 (1988). This burden was clearly not satisfied by the evidence submit ted by the McDermotts, which consisted of evidence of Knight-Ridder’s generalized role as the parent company of PNI, Roberts’ direct employer. Despite certain representations to the contrary by the McDermotts, in fact
 
 no
 
 evidence whatsoever was adduced to demonstrate that in editing or publishing ATL I Roberts was under the control of KnightRidder. Indeed, the testimony of Roberts himself points to the opposite conclusion. Roberts testified that he did not maintain day-to-day contact with Knightr-Ridder and that it was Knight-Ridder’s policy to allow its newspapers to be edited locally. This policy was apparently followed in this instance, as there is no evidence that Knight-Ridder was in any way involved in the preparation, editing or publication of ATL I. The nonsuits in favor of Knight-Ridder must be affirmed.
 

 VI.
 
 MILKOVICH ISSUES
 

 Prior to concluding our analysis of this case, one issue remains to be discussed. The McDermotts devote a lengthy portion of their brief to a discussion of the impact of the Supreme Court’s decision in
 
 Milkovich v. Lorain Journal Co.,
 
 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), on this case.'
 
 Milkovich
 
 was decided immediately prior to the trial of this action. However, its impact was apparently not fully analyzed until the post-trial motion stage. It was only then that the
 
 *125
 
 trial court decided that
 
 Milkovich
 
 had materially changed the law regarding when statements of opinion can be the basis for a defamation action and required a re-evaluation of the allegedly defamatory statements involved in this case.
 

 In
 
 Milkovich,
 
 the Supreme Court determined that not all statements of “opinion” are automatically exempt from being the basis for an action for defamation. Rather, the court stated that only a “statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection.”
 
 Id.
 
 at 20, 110 S.Ct. at 2706, 111 L.Ed.2d at 18. Applying
 
 Milkovich
 
 to the instant case, the trial court concluded that those aspects of the articles relating to nepotism and Justice McDermott’s involvement in the District Attorney’s hiring of the justice’s son were actionable, but the aspects relating to the Coal and Filbert Partnership Cases were not. The court concluded that the latter portions of the articles suggested that Justice McDermott’s decision-making in the Coal and Filbert Partnership Cases was influenced by improper factors, including his friendship with certain parties involved in those cases. The trial court further found that there was no core of objectively verifiable fact underlying the suggestions of improper influence and they could never be proven false because it was impossible to prove objectively what did or did not influence Justice McDermott’s thoughts and decisions concerning those cases. Therefore, the court held that those portions of the articles were not actionable defamation. However, since the court had decided that the remaining allegedly defamatory portions of the articles were actionable under
 
 Milkovich,
 
 the court denied PNI judgment n.o.v. on this ground.
 

 The McDermotts would have this court conduct a full review of the trial court’s application of
 
 Milkovich
 
 to this case and hold that the trial court erred insofar as it decided that the Coal Case and Filbert Partnership Case aspects of the articles were not actionable defamation. They urge us to decide that all three allegedly defamatory aspects of the articles are actionable defamation as a matter of law under
 
 Milkovich.
 
 However, since the trial court ultimately refused
 
 *126
 
 to grant PNI judgment n.o.v. on this ground, it is not a proper issue for the McDermotts to raise in this appeal. They are not actually aggrieved by the trial court’s decision, since they did not lose their verdict as a result of it. Pa.R.A.P. 501.
 

 Although we recognize that the McDermotts disagree with the aspect of the trial court’s decision concerning the Coal and Filbert Partnership Case aspects of the articles, there is no form of appellate relief this court can appropriately provide on this issue at this time. We emphasize, however, that the trial court’s conclusions regarding the status of the Coal and Filbert Partnership Cases aspects of the articles under
 
 Milkovich
 
 should not be considered binding upon the retrial of this matter. There has been no final adjudication of that issue and it remains open for reconsideration by the trial court on remand.
 

 VII.
 
 CONCLUSION
 

 The trial court’s order denying judgment n.o.v., granting a new trial and granting a compulsory nonsuit in favor of KnighiARidder Newspapers, Inc. in these consolidated actions is AFFIRMED.
 

 [2]
 

 . This case was reassigned to this author in March 1994.
 

 [3]
 

 . The Honorable James T. McDermott died on June 21, 1992, after the jury had returned a verdict and post-trial motions had been filed. The executors of his estate were substituted as plaintiffs in these matters. For convenience of reference, the executors, appellants before this court, will hereinafter be referred to as the McDermotts.
 

 [4]
 

 . Appellees-cross-appellants are hereinafter collectively referred to as PNI.
 

 [5]
 

 . Although several other persons had originally been named as defendants along with PNI, Biddle and Knight-Ridder, all of these other defendants were dismissed from the case and no issues relating to their dismissal are raised in this appeal.
 

 [6]
 

 . In general, “[a] communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.”
 
 Livingston v. Murray,
 
 417 Pa.Super. 202, 612 A.2d 443 (1992),
 
 allo. denied,
 
 533 Pa. 601, 617 A.2d 1275 (1992).
 

 [7]
 

 . We note that in this regard,
 
 Williams
 
 supports our decision finding no waiver in PNI's failure to object to the trial court’s jury instructions. As in
 
 Williams,
 
 here the trial court did not ask or instruct the jury to return inconsistent verdicts and, thus, PNI had no duty to object at that time.
 

 [8]
 

 . We point out that
 
 Curran
 
 does not represent precedent on the issue of waiver. Four judges found that the issue was not waived. In the majority opinion, four judges found waiver. The fifth vote in the majority merely concurred in the result. In order for any principle of law expressed in the majority opinion to be considered precedent it must command a majority of judges voting both as to the disposition and the principle of law expressed.
 

 [9]
 

 . Appellants also rely on
 
 Burgan v. City of Pittsburgh,
 
 115 Pa.Commw. 566, 542 A.2d 583 (1988),
 
 appeal denied,
 
 521 Pa. 613, 557 A.2d 344 (1989). We take no guidance from this decision for the following reasons. First, it is a decision of the Commonwealth Court which does not bind this court and certainly cannot be followed in lieu of binding Supreme Court precedent on the issue presented. Moreover, the
 
 Burgan
 
 Court expressly noted that the opinion was advisory insofar as it discussed the inconsistent verdicts issue.
 
 Id.
 
 at 581-84, 542 A.2d at 591.