HARRISBURG SCHOOL DISTRICT, Harrisburg School Board, Joseph C. Brown, Linda M. Cammack, Judith C. Hill, Wanda R.D. Williams, Individually, and as Parent and Natural Guardian of Rauwshan Williams, Ricardo A. Davis, Individually and as Parent and Natural Guardian of Jeremiah Stephenson and Tiffany Davis, Clarice Chambers, Joy Ford, Individually, and as Parent and Natural Guardian of Casel J. Ford, Susan Wilson, Individually, and as Natural Parent and Guardian of Brandi Wilson and Samantha Wilson, Grace Bryant, Individually, and as Parent and Natural Guardian of Corey Bryant, Glenise Cobb–Wingfield, Individually, and as Parent and Natural Guardian of Jhonatha Wingfield and Asia Wingfield, Petitioners,

v.

Eugene HICKOK, Secretary of Education, Commonwealth of Pennsylvania, Stephen R. Reed, Mayor of Harrisburg, Tom Ridge, Governor of Pennsylvania, Jane/John Doe I, Jane/Joe Doe II, Jane/John Doe III, Jane/John Doe IV, Jane/John Doe V, Potential Members of the Board of Control for the Harrisburg School District, Respondents.

Commonwealth Court of Pennsylvania.

Argued Sept. 13, 2000.
Decided Nov. 13, 2000.
As Amended Nov. 15, 2000.

Marci A. Hamilton, Yardley, for petitioners.

Daniel J. Doyle, Harrisburg, for respondents, E. Hickok and Governor Ridge.

Todd P. Prugar, Harrisburg, for respondents, Mayor Reed, J. Doe I–V and Potential Members of the Bd. of Control for the Harrisburg School Dist.

Linda J. Shorey, Harrisburg, for intervenors, Senators R. Jubelirer and M. Ryan.

Before DOYLE, President Judge, COLINS, Judge, McGINLEY, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, KELLEY, Judge, FLAHERTY, Judge.

PELLEGRINI, Judge.

Before this Court are preliminary objections filed by the respondents in the above-captioned action (collectively, the Commonwealth) in response to an amended petition for review in the nature of a complaint in equity and for declaratory relief filed by the petitioners in the above-captioned action (collectively, the Harrisburg School District) challenging the constitutionality of the Education Empowerment Act, Act No. 2000–16 (Act 16) and specifically Section 1707–B of Act 16 known as the "Reed Amendment" dealing with the Harrisburg School District.

**I.**

The Education Empowerment Act authorizes the Secretary of Education to place the control of a school district in a Board of Control where the school district has a history of low test scores. On March 24, 1999, Senate Bill 652 (SB652) was introduced and was titled, "An Act Amending the act of March 10, 1949, P.L. 30" (the Public School Code of 1949, 24 P.S. §§ 1–101–27–2703), but only proposed to amend one specific section of the School

Code and to add a new section authorizing vocational-training schools to establish capital reserves. Following a number of amendments not relevant here, on June 8, 1999, the bill was passed by the Senate. After additional amendments, again not relevant here, on June 16, 1999, the bill was passed by the House of Representatives. The bill was then returned to the Senate and referred to the Committee on Rules and Executive Nominations.

On May 2, 2000, the bill was reported from the Senate Rules Committee with further amendments and again passed by the Senate. In the House, the bill was referred to the House Rules Committee, which inserted substantial material into the bill. This material added a new article to the School Code entitled the "Education Empowerment Act" (EEA). The title of the bill was amended to reflect the inclusion of these provisions. On May 3, 2000, the House passed the amended bill, and on the same day, the Senate concurred and the bill was sent to the Governor who signed it on May 10, 2000.[1]

With the passage of the EEA, the Secretary of Education is to establish an "Education Empowerment List." Section 1703–B of the School Code.[2] School districts that meet the statutory definition of a "history of low test performance" are placed on the list. The affected districts are to be notified of the their placement on the list, and the list itself is published in the Pennsylvania Bulletin. After notification, the following occurs:

1) The Department of Education (the Department) establishes an Academic Advisory Team for each affected District;

2) The affected District establishes a School District Empowerment Team to work with the Academic Advisory Team to develop an Improvement Plan, which is submitted to the Department;

3) The Department reviews the Plan, and may either approve it or request modifications; and

4) The Board of Directors of the affected District "shall implement" the approved plan, notwithstanding any other provision of law to the contrary.

In the event that the affected District does not meet the goals established in the plan within 3 years, pursuant to Section 1705–B, the District is declared an "Education Empowerment District" and the Secretary may grant an additional year within which the District can meet the Plan's goals. Once declared an Education Empowerment District, it is placed under a Board of Control consisting of the Secretary of Education or his designee and two residents of a county in which the affected District is located who are appointed by the Secretary. The Board of Control assumes all powers and duties conferred by law on the Board of School Directors with the exception of the power to levy taxes. Section 1706 B. When an affected District has met the goals in its improvement plan and no longer has a history of low test performance, control is restored to the Board of School Directors. Section 1710–B.

There are two school districts that are admittedly treated differently from the way other districts are that are designated as an "Education Empowerment District."[3] In this case, only Section 1707–B of Act 16, commonly referred to as the

1. The Court takes judicial notice of the legislative history of Senate Bill 652, as set forth on the website of the Pennsylvania Senate. The specific URL of the Bill's history may be found at *http://www.legis. state.pa.us/ WU01/ LI/BI/BH/1999/0/SB0652.HTM.*

2. The EEA is contained in Section 8.1 of Act 16. All citations in this opinion will be to the added sections of the School Code contained in Section 8.1 of Act 16.

3. The other provision dealt with school districts that had a history of low test performance and had been certified as fiscally distressed for a minimum period of two years. Chester–Upland School District was the only district that fell within that provision. A separate action is currently pending at 277 M.D. 2000 challenging the legislation on much the same basis as this case.

"Reed Amendment" after the current Harrisburg Mayor Stephen Reed, is at issue because it treats, as admitted by the Commonwealth, Harrisburg School District different from any other district in the Commonwealth. That section provides that "certain school districts" are defined as, "[A] school district of the second class with a history of low test performance which is coterminous with the city of the third class which contains the permanent seat of government..."; i.e., the Harrisburg School District.

For the Harrisburg School District, the Secretary is directed to waive the inclusion of the district on the list and immediately certify the district as an education empowerment district. Unlike other districts, because the Harrisburg School District is certified under Section 1707–B, it does not come under the control of a three-member Board of Control. Instead, the mayor of the coterminous city, Harrisburg, appoints a five-member board that serves at the pleasure of the mayor. The mayor, rather than the affected district, appoints an education empowerment team to develop an improvement plan for transmission to the Department. The Department is not required to appoint an academic advisory team to assist the empowerment team in developing the improvement plan. Moreover, while the empowerment teams in other affected districts elect their chairperson, the team appointed by the mayor under the Reed Amendment is chaired by the Mayor or his designee. In summary, then, in contrast to the other districts, the district described by the Reed Amendment is immediately placed under the control of a distinct type of Board of Control, entirely devoid of state supervision or input, and controlled by the mayor of a specific city of the third class rather than the affected district.

## II.

Shortly after Act 16 became effective, the Harrisburg School District filed its amended petition for review on behalf of school children, voters and taxpayers in its district, as well as on behalf of its School Board as a result of the enactment of the Reed Amendment, Section 1707–B of Act 16. It sought to have the Act generally declared unconstitutional because of various defects in the manner in which it was enacted, void on the basis that it violates the United States and Pennsylvania Constitutions by discriminating against the Harrisburg School District by violating its due process and equal protection rights, as well as seeking to have the Reed Amendment declared unconstitutional under Article III, Section 32 of the Pennsylvania Constitution.

Specifically, the Harrisburg School District asserted in its petition the following nine counts:

- **Count I—Violation of Article III, Section 32 of the Pennsylvania Constitution.** Act 16 creates a special class of one school district, the Harrisburg School District, in violation of Article III, Section 32 which prohibits the General Assembly from passing a local or special law regulating school districts.

- **Count II—Violation of Article III, Section 1 of the Pennsylvania Constitution.** Act 16 in its original form and purpose was radically different from the final amended and passed version in violation of Article III, Section 32 which prohibits the passing of a bill whose original purpose has been altered or amended.

- **Count III—Violation of Article III, Section 2 of the Pennsylvania Constitution.** Act 16 was inserted hastily into Senate Bill 652 after the publication of SB652, and in direct contravention of Article III, Section 2, SB652 containing the EEA was not printed for the members of the Rules Committee of the House to consider before their vote.

- **Count IIIA—Violation of Article III, Section 3 of the Pennsylvania Constitution.** The subject of Act 16 was

not clearly expressed in the title of SB652 as required by the Pennsylvania Constitution and failed to identify the purpose of the Act and that the Harrisburg School District was being singled out for special treatment.

- **Count IV—Violation of Article III, Section 4 of the Pennsylvania Constitution.** The enactment of Act 16 violated Article III, Section 4 because it was not considered on three different days on the floors of either the Senate or the House and many state legislators were unaware that the Reed Amendment had been inserted into SB652.

- **Count V—Violation of Article III, Section 6 of the Pennsylvania Constitution.** The sections of the Public School Code of 1949, Act of March 10, 1949, that were amended by Act 16 were not re-enacted and published at length as required by Article III, Section 6.

- **Count VI—Violation of Article III, Section 7 of the Pennsylvania Constitution.** Act 16 constitutes a special bill and it was passed without notice in violation of Article III, Section 7.

- **Count VII—Unconstitutional Delegation of Legislative Power.** The power to maintain and support Pennsylvania's public school system is legislative in nature and Mayor Reed, a part of the executive branch, is delegated unfettered powers over Harrisburg's public schools. The Mayor has unilateral control over a substantial part of Harrisburg School District's policies and legislative functions of the School Board unlike other school boards that are given an opportunity to set goals for improving the performance of their districts. The Mayor, who is part of the executive branch of government, has illegally been delegat-

ed powers which may only be exercised by the legislature.

- **Count VIII—Violation of Pennsylvania and United States Constitutions Equal Protection Guarantees.** The Harrisburg School District is treated differently from all other school districts, including the Duquesne Districts that have higher student failure rates in math and reading, because it is immediately subject to certification as an education empowerment district placed under a Board of Control for a minimum of five years regardless of the students' test scores. Singling out the Harrisburg School District is not related to a legitimate state interest, is irrational and violates the equal protection guarantees of both the United States and Pennsylvania Constitutions. The Reed Amendment casts a stigma on Harrisburg School District students of which 70% live below poverty level even though there are other school districts in Pennsylvania with comparable socioeconomic conditions.

- **Count IX—Violation of Pennsylvania and United States Constitutions Due Process Guarantees.** Under Act 16, the Harrisburg School District, unlike every other school district in the Commonwealth of Pennsylvania, may not petition to be removed from the Education Empowerment List for a minimum of five years thereby violating its due process rights. The Commonwealth has no legitimate interest in distinguishing the Harrisburg School District from other school districts in terms of its right to petition for removal from the Education Empowerment List.

▇▇ In response to the petition for review, the Commonwealth has filed preliminary objections[4] contending that the

4. When considering preliminary objections in the nature of a demurrer, our scope of review is to determine whether on the facts alleged, the law states with certainty that no recovery is possible. *Rouse & Associates–Ship Road Land Limited Partnership v. Pennsylvania Environmental Quality Board,* 164 Pa.Cmwlth. 326, 642 A.2d 642 (1994). In ruling on pre-

School District lacks standing, Counts I through IX fail to state a claim upon which relief may be granted, and Counts II, III, IIIA, IV, V and VI present non-justiciable issues.

## III. STANDING

The Commonwealth objects to the standing of the Harrisburg School District to bring this action because school districts have only those powers that the legislature has granted them, and creations of the state, such as school districts, do not have the power to challenge the constitutionality of their creator's actions. Initially, we point out that there is nothing in any of the legislation pertaining to school districts or school boards that prohibits either one from bringing an action such as this one, and, in fact, Section 213 of the Public School Code, 24 P.S. § 2–213,[5] provides a school district with the right to sue. As to the general issue of standing, in *Defazio v. Civil Service Commission of Allegheny County*, 562 Pa. 431, 756 A.2d 1103 (2000), recently, our Supreme Court addressed whether a sheriff had standing to challenge a state statute that affected his control over his employees. Our Supreme Court set forth the test for standing as follows:

> The test for standing is that "one who seeks to challenge governmental action must show a direct and substantial interest [and] a sufficiently close causal connection between the challenged action and the asserted injury to qualify

the interest as 'immediate' rather than remote." *Allegheny County v. Monzo*, 509 Pa. 26 [33–35], 500 A.2d 1096, 1100 (Pa.1985) (citing *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269 (Pa.1975)). We further explained that a substantial interest requires "some discernible adverse effect to some interest other than the abstract interest of all citizens in having others comply with the law.... [D]irect simply means that the person claiming to be aggrieved must show causation of the harm to his interest by [the government's actions]." *Monzo* at 1100. The immediacy or remoteness of the injury is determined by the "nature of the causal connection between the action complained of and the injury to the person challenging it." *Id.*

*Defazio*, 756 A.2d at 1105. It held that the sheriff had standing because he had a substantial interest in the management of the office and the Act in question interfered with his ability to manage his employees.

■■■■ In this case, the Harrisburg School District is certainly affected because other than levying taxes, the affairs of operating the school district have been taken away from it. As in *Defazio*, because the Harrisburg School District has a substantial, direct and immediate interest in the outcome of this matter, it has standing to bring this action. The Commonwealth's preliminary objection based on standing is, therefore, denied.[6]

liminary objections, the Court must consider the evidence in the light most favorable to the non-moving party, i.e., the Harrisburg School District. *Derman v. Wilair Services, Inc.*, 529 Pa. 621, 600 A.2d 537 (1991). If the grant of preliminary objections will result in the dismissal of the case, the objection should be sustained only if it is clear and free from doubt. *Zinc Corporation of America v. Department of Environmental Resources*, 145 Pa. Cmwlth. 363, 603 A.2d 288 (1992), *aff'd*, 533 Pa. 319, 623 A.2d 321 (1993).

5. Section 213 provides:

Each school district shall have the right to sue and be sued in its corporate name. Any

legal process against any school district shall be served on the president or secretary of its board of school directors.

6. The Commonwealth also argues that Governor Ridge is not a proper party to this action because nothing in Act 16 gives the Governor any specific authority. While the Harrisburg School District contends that he is a proper party because he participated in the lawful process of signing and enacting the Reed Amendment, the act of signing legislation violates no rights. The true party in interest is the government official who implements a law. *See City of Pittsburgh v. Commonwealth*, 112 Pa.Cmwlth. 188, 535 A.2d 680 (1987), *aff'd*, 522 Pa. 20, 559 A.2d 513 (1989).

## IV. SPECIAL LEGISLATION

### A. COUNT 1

The Commonwealth contends that the Harrisburg School District has failed to state a claim upon which relief may be granted in Count I of its petition claiming that Act 16 does not violate Article III, Section 32 because it is not special legislation. In making that contention, the Commonwealth contends that Article III, Section 32 does not constitute a special or local law as the concept is meant in Article III, Section 32. In its brief, it sets forth essentially two reasons why the Reed Amendment is not special legislation. It contends that:

Although it has a local effect on some school districts, the Act in its entirety deals with education matters affecting the entire Commonwealth. [1] The provisions of Act 16 which constitute the EEA have, for the most part, state-wide applicability, though presently only a small number of schools may take advantage of its provisions. A small part of the Act currently applies only to the Harrisburg School District and is likely never to apply to any other community. [2] However, the fact that § 1707–B specifically refers to the permanent seat of government of the Commonwealth suggests that Harrisburg has a special role within the Commonwealth unlike that of any other community. That special role and Harrisburg's unique relationship with the Commonwealth, described in detail above, make § 1707–B a law directly affecting the general welfare of the Commonwealth and not simply a local or special bill in the traditional sense.

(Commonwealth's brief at 13.)

In order to address the Commonwealth's contentions, we must first examine what the electorate meant when it adopted Article III, Section 32 of the Pennsylvania Constitution which provides:

The General Assembly shall pass no local or special law in any case which has been or can be provided for by general law and specifically the General Assembly shall not pass any local or special law.

1. Regulating the affairs of counties, cities, townships, wards, boroughs, *or school districts.* (Emphasis added.)

\* \* \*

Nor shall the General Assembly indirectly enact any special or local law by the partial repeal of a general law; but laws repealing local or special acts may be passed.[7]

■ This constitutional proscription against special legislation has been a part of the Pennsylvania Constitution since 1874, and was "adopted for a very simple and understandable purpose—to put an end to the flood of privileged legislation for particular localities and for private purposes which was common in 1873."[8] *Hav-*

---

7. Article III, Section 32 was originally adopted as Article III, Section 7. In 1967, Article III was amended and its sections renumbered.

8. As examples of the types of special legislation enacted prior to the Constitution of 1874, following are but a few of several hundred special acts passed by the General Assembly during the session of 1873, while the constitutional convention was meeting:

Act 63 of 1873—"An Act authorizing the burgess and town council of Wellsboro, in the county of Tioga, to levy taxes, borrow money and regulate the election of borough council."

Act 65 of 1873—"An Act authorizing the town council of the borough of Carlisle to establish a board of health."

Act 71 of 1873—"An Act to authorize the town council of the borough of Sunbury to borrow money."

Act 77 of 1873—"An act to validate the sale of certain real estate of Henry Altman, deceased."

Act 81 of 1873—"A Supplement to an act ... changing the time of holding the courts in the Sixteenth Judicial District." (Bedford County).

Act 94 of 1873—"An Act to authorize the pre-payment of all justice and officers' costs on appeal from justices of the peace, in and

*erford Township v. Siegle,* 346 Pa. 1, 6, 28 A.2d 786, 788 (1942). Commenting on the reason and the purpose behind the adoption of Article III, Section 32, our Supreme Court, in *City of Philadelphia v. Perkins,* 156 Pa. 554, 27 A. 356 (1893), in invalidating an act as special legislation, stated:

> If this act be sustained, the same sort of legislation can regulate the affairs of the most insignificant borough in the commonwealth, and we may expect a flood of the same vicious local laws which preceded the adoption of the constitution of 1874. It is certainly not forgotten that the well-nigh unanimous demand which brought the convention of 1873 into existence was prompted by the evils springing from local and special legislation . . . [T]his article was the most prominent feature of it, was adopted by an unprecedented majority on a direct vote, indicating a settled determined purpose on part of the people to hold back from the legislature the power to enact local and special laws. Every department of government is bound by its provisions, but especially is this, for on it is the duty of judicially determining any violation of it. The state as a whole is subject to it; the largest municipality as well as the smallest township.

156 Pa. at 565, 27 A. at 360 (1893); *see also Commonwealth v. Gilligan,* 195 Pa. 504, 513, 46 A. 124, 126 (1900) (Article III addressed "[t]he evil [of] interference of the legislature with local affairs without consulting the localities and the granting of special privileges or exemptions to individuals or favored localities.").

More recently in *Common Cause of Pennsylvania v. Commonwealth,* 668 A.2d 190, 210 fn. 12 (Pa.Cmwlth.1995) *aff'd,* 544 Pa. 512, 677 A.2d 1206 (1996), we quoted from the work of the Honorable Robert E. Woodside, a noted state constitutional scholar, who summarized the evils intended to be remedied by the framers of the 1874 Pennsylvania Constitution as follows:

> The General Assembly and its enactment of laws was substantially changed in the Constitution of 1874. Prior to that time, nearly 95% of the statutes passed were special or local acts doing such things as: granting divorces and annulments to specific couples, opening and closing an alley in a particular borough, changing the venue of a specific case, granting profit and non-profit corporations to individuals to operate banks and all kinds of associations, granting a right to operate a ferry at Millersburg, annexing a particular farm to a borough, appropriating a substantial sum of money to an individual for his raising troops during the Civil War.
>
> The procedure not only opened the door to log rolling, favoritism, and even bribery, but made them a way of legislative life. Most of the evils which existed in the General Assembly of Pennsylvania and in the Congress of the United States were examined with the idea of correcting them in the new Constitution. The result is found in the required method of enacting legislation contained in Article III.

Robert E. Woodside, Pennsylvania Constitutional Law at 295 (1985).

■ Although the people of Pennsylvania purposefully restricted the General Assembly's ability to enact special and local

---

for the counties of Armstrong, Clarion, Delaware and Lawrence."

Act 98 of 1873—"An act to fix monthly return days in the courts of Huntingdon, Bedford, Fulton, Juniata and Union counties."

Act 112 of 1873—"An act relating to the fees of the sheriff, and the salaries of the directors of the poor in Dauphin county."

Act 121 of 1873—"A Supplement to an act to regulate medical practice in certain counties of this commonwealth . . . extending the same to Lancaster, Cumberland and Susquehanna counties."

Act 145 of 1873—"An act granting a pension to Jacob Hurst."

Act 182 of 1873—"An act to exempt the German Hospital of the city of Philadelphia from certain taxes."

Act 207 of 1873—"An Act to annul the marriage contract between Lillie S. Evans and Charles H. Evans."

legislation, the Constitution does not require all legislation be applicable to the entire Commonwealth. Article III, Section 20 [9] specifically grants to the legislature the power to classify counties, cities, boroughs, school districts and townships according to population and provides that all laws passed relating to such classes shall be deemed general legislation. Where, however, "the class to which a statute is made is unnecessarily restricted or improperly selected, the law is special." *Chalmers v. City of Philadelphia,* 250 Pa. 251, 95 A. 427 (1915).

For nearly 70 years after the adoption of the proscription against local and special laws, population was recognized as the *sole* valid ground for classification of municipalities.[10] Since 1942, however, our Supreme Court has recognized that the legislature may create classifications based on something other than population if it does not establish a closed class. *Haverford Township.*[11]

■ The current state of the law then is that the General Assembly may establish classifications without violating Article III, Section 32 only so far as to see that it is founded on real distinctions between the local government classified and not on artificial or irrelevant ones, used for the purpose of evading constitutional prohibition. *Freezer Storage v. Armstrong Cork. Co.,* 476 Pa. 270, 382 A.2d 715 (1978).

With that background, we will now address the Commonwealth's specific contentions. As to the Commonwealth's argument that the Reed Amendment is not special legislation because it deals with only one school district and is contained in a much larger bill applicable to all school districts, that contention would make Article III, Section 32's prohibition meaningless. All that would have to be done is to place in an otherwise general bill a special provision that affects only one school district or a number of provisions each dealing only with one school district. That outcome could resurrect the log rolling and favoritism that Article III, Section 32 was enacted to prevent, as well as having the General Assembly deal with matters in general while leaving local officials to deal with the implementation of general laws at a local level making this constitutional provision meaningless.

The Commonwealth's other argument is that even though the Reed Amendment deals only with a closed class of one, it is not special legislation because Harrisburg is the state capital and it can be treated differently than any other district in the Commonwealth. In effect, it is arguing that Article III, Section 32 is satisfied if there is some rational reason to create a class of one. Both Pennsylvania Courts and other state courts have addressed arguments that nothing is wrong in creating a class of one because Pennsylvania is not unique in having a constitutional provision prohibiting special legislation to guard against the same abuses that formerly occurred in Pennsylvania. In addressing this argument, the Supreme Court of Colorado articulated an especially cogent analysis equally applicable to this case. Like Article III, Section 32, the Colorado Constitution also contains a "two-pronged" special legislation clause, flatly prohibiting special legislation in enumerated instances and restricting it in other instances to cases in which a general law cannot be made applicable. In addressing the standard to be used to determine whether a provision was special legislation, the Colorado Supreme Court stated that it was

---

9. Originally, Article III, Section 34.

10. By way of example, an act attempting to classify school districts by the number of teachers employed was found to constitute special legislation and declared invalid. *In re Merger of Reed Township School District,* 34 Pa. D. & C. 389 (C.P.Pa.1939).

11. In *Haverford Township,* an act applicable to municipalities having three or more police officers regardless of population was held constitutionally permissible.

more than a redundant equal protection clause stating:

> The question posed by Article V, section 25, is whether the legislation creates true classes and, if so, whether the classifications are reasonable and rationally related to a legitimate public purpose.

> \*    \*    \*

> Even where an enumerated prohibition is implicated, however, if there is a rational reason for distinguishing the class involved and the members of that class are treated alike, the legislation is not special. When an enumerated prohibition is implicated, the class cannot be limited to one.

> If no enumerated prohibition is implicated, the question of whether a general law could be made applicable is within the discretion of the General Assembly, and will not be disturbed absent an abuse of discretion. That standard requires only that whatever classification is employed by the legislature be "reasonable."

Recently, we have applied the rational basis test to any challenge under article V, section 25, regardless of whether the challenge was simply that a general law could have applied.

The prohibition against special legislation, however, is more than a redundant Equal Protection Clause. First, if an act is challenged as special legislation, and an enumerated prohibition is implicated, the threshold question is whether the classification adopted by the legislature is a real or potential class, or whether it is logically and factually limited to a class of one and thus illusory. If there is a genuine class, the next question is whether the classification is reasonable. If the classification is reasonable, the act is not barred by Article V, section 25.

If the challenge is based on the final clause of article V, section 25, i.e., that a general law could be made applicable,

the question is whether the General Assembly acted arbitrarily or capriciously in its decision that a special law is required. If no enumerated prohibition is implicated, the size of the class becomes irrelevant so long as the legislature has not abused its discretion.

*In re Interrogatory Propounded by Governor Romer*, 814 P.2d 875 (Colo.1991). In *Harristown Development v. Dept. of General Services*, 532 Pa. 45, 614 A.2d 1128 (1992), our Supreme Court essentially agreed with the reasoning of the Colorado Supreme Court that the special legislation clause is more than a redundant equal protection clause when it held that a class which contained only one member was not facially unconstitutional "so long as other members might come into that class." *Id.* at 53, fn. 9, 614 A.2d at 1132, fn. 9 (citing *Haverford Township*, 346 Pa. at 6, 28 A.2d at 789).

While acknowledging that today the Reed Amendment can only apply to one school district—the Harrisburg School District—the Commonwealth argues that it is not a closed class because it potentially can apply to other cities as there is a possibility that the capital could move. Precedent does not support this logic. In 1878, only five years after adoption of the constitutional prohibition, the General Assembly attempted to circumvent a constitutional proscription against locating or changing county seats [12] by enacting a law providing:

> That in all counties of this commonwealth where there is a population of more than sixty thousand inhabitants, and in which there shall be any city incorporated at the time of the passage of this act with a population exceeding eight thousand inhabitants, situate at a distance from the county seat of more than twenty-seven miles by the usually traveled public road, it shall be the duty of the president judge or of the additional law judge, or of either, to make an

**12.** This is also one of the "enumerated proscriptions" found in Article III, Section 32.

order providing for the holding of one week of court, ... after each regular term of court for said county, for the trial of civil or criminal cases in said city.

Act of April 18, 1878, P.L. 29.

The Supreme Court, in an opinion by Justice Paxson, concluded that although the Act was couched in language purporting to create a "class":

> This is classification run mad. Why not say all counties named Crawford, with a population exceeding sixty thousand, that contain a city called Titusville, with a population of over eight thousand, and situated twenty-seven miles from the county seat? Or all counties with a population of over sixty thousand watered by a certain river or bounded by a certain mountain? There can be no proper classification of cities or counties except by population.[13] The moment we resort to geographical distinctions we enter the domain of special legislation, for the reason that such classification operates upon certain cities or counties to the perpetual exclusion of all others. The learned judge finds the fact that Crawford County is the only county in the state to which the Act of 18th April, 1878 can apply at the present time. Said act makes no provision for the future, in which respect it differs from the Act of 1874,[14] which, in express terms, provides for future cities and the expanding growth of those now in existence. That is not classification which merely designates one county in the Commonwealth and contains no provision by which any other county may by reason of its increase in population in the future, come within the class.

*Commonwealth ex rel. Fertig v. Patton*, 88 Pa. 258, 260 (1878).

What was said by Justice Paxson so long ago is equally cogent today—this is classification run mad. There is only one "permanent seat of government." The City of Harrisburg was designated as such by the Act of February 21, 1810. Article III, Section 28 provides that "no law changing the permanent location of the Capital of the State shall be valid until the same shall have been submitted to the qualified electors of the Commonwealth at a general election and ratified and approved by them." Moreover, not only do we have to speculate that in some point in the future that the capital would move, we also have to speculate that if the "permanent seat of government" were to be moved, the Reed Amendment would not apply unless the new capital happened to be a City of the Third Class coterminous with the boundaries of a School District of the Second Class with a history of low test scores on the effective date of the Act. Such a scenario is so remote as to be deemed practically impossible.

Even if we had held that the Reed Amendment was not special legislation because it created a closed class of one, the Harrisburg School District, we still would have struck down the Reed Amendment because no rational basis exists to treat that district different than other districts. The Commonwealth argues that the state government has a need for educated workers, which presumably will be met by improving the academic standards of the Harrisburg School District. It further argues that the Harrisburg School District is "different" from any other district in this Commonwealth due to the large amount of tax-exempt real estate located in the City. The Commonwealth's argument misses the point, however, because, as stated earlier, the "rational basis" test comes into play *only* after it has been determined that a closed class does not exist.

Not only is this argument rejected for that reason, but also because it would turn Harrisburg from a "City of the Third Class" into a "City of the Capital Class,"

---

13. This sentence was found to be *dicta* and expressly disapproved in *Haverford Township*.

14. Establishing classes of cities, *see Wheeler v. Philadelphia*, 77 Pa. 338 (1875).

which, for all intents and purposes, would turn Harrisburg into a city about which the General Assembly could legislate anything it wanted without making such legislation applicable to other cities of the third class. The Constitution nowhere suggests that the capital is or can be such a special class. This rationale that someplace is special because it has unique circumstances would also allow the General Assembly to legislate for other localities based on their "unique" circumstances; e.g., Philadelphia as the center of commerce; State College as the center of education, a result that Article III, Section 32 was adopted by the citizens of this Commonwealth to prohibit. Most disturbingly, that argument treats the education of students of Harrisburg as more "special" than that of other students in the Commonwealth, which is simply not true; all students are equally "special" no matter whether they live in the state capital or not.

Moreover, just because there is a great need and there is a "man on a white horse" who will attempt to rectify the situation (Harrisburg) or the situation is so grave (Chester Upland) does not mean that the Constitution should be ignored. In this respect, the words of Justice Paxson still ring true, despite the passage of more than a century. That which is constitutionally proscribed may not be circumvented, whether for good cause or bad. The framers of the Constitution of 1873 did not include with the prohibition on special legislation a caveat that it would be acceptable for good cause shown. Just as the citizens of Titusville may have had good cause for requesting a courthouse in their city in 1878, the citizens of Harrisburg certainly have a grave interest in the improvement of their public schools. The concerns of both were addressed by the legislature, and the attempt in both cases could be seen as laudable. The touchstone of legislation, however, is not that it is laudable or even that it reflects the public will, but that it is also within the limits of our Constitution. This was aptly stated by Justice Dean in *Perkins:*

Another point made in the argument before us—that the public sentiment of Philadelphia with practical unanimity demanded the passage of this law—was doubtless more effectively urged before the legislature. But the question presents itself to us in a different shape. We do not believe the intelligent public sentiment of the greatest city of the commonwealth demands the accomplishment of a lawful purpose by unlawful means. Unconstitutional statutes are the very essence of lawlessness. Even if the unanimous public sentiment of the city demanded the enforcement of the act, we could not heed it. Public sentiment properly may move courts in matters wholly discretionary, such as the adoption of rules to speed causes, afford quick relief to suitors, and eradicate abuses in the administration of justice; but such sentiment can have no place in the interpretation of a constitution. The public sentiment expressed in that instrument is the only sentiment of which a court can take notice. It contains the deliberate, emphatically expressed sentiment of the whole people. They, and they alone, can change it, but even they cannot trample upon it. If laws in conflict with it be passed by the legislature, be approved by the governor, and sustained by this court, that is revolution. It is no less revolution because accomplished without great violence. It matters little to the house owner whether the structure intended to shelter him be blown up by dynamite, or the foundation be pried out, stone by stone, with a crowbar; in either case he is houseless. There can be no stability in a free government if successful assaults in any department be made on the fundamental law, the supreme law, deliberately established by the whole people as a rule of action in all governmental matters affecting their welfare.

*Perkins*, 156 Pa. at 567–68, 27 A. at 361–62.

▪ While the authority of the legislature to classify school districts based on low test scores may be rational, the Reed

Amendment treats one specific district in an entirely different manner and applies to a class that is logically and factually limited to one. Accordingly, I conclude that the Reed Amendment creates a class of one that is merely illusory, and, therefore, does not meet the threshold determination of a "genuine class." (*See also* the discussion on equal protection, *infra.*)

■ Because the Reed Amendment violates Article III, Section 32 of the Pennsylvania Constitution, the Commonwealth's preliminary objection to Count I is denied.[15]

## B. COUNTS II, III, IIIA, IV, V and VI—NON JUSTICIABLE ISSUES

The Commonwealth argues next that Counts II,[16] III,[17] IIIA,[18] IV,[19] V[20] and

15. Necessarily, because we find it is special legislation, we will not dismiss this count.

16. Count II alleges a violation of Article III, Section 1 of the Pennsylvania Constitution which provides:
   No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose.

17. Count III alleges a violation of Article III, Section 2 of the Pennsylvania Constitution which provides:
   No bill shall be considered unless referred to a committee, printed for the use of the members and returned therefrom.

18. Count IIIA alleges a violation of Article III, Section 3 of the Pennsylvania Constitution which provides:
   No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof.

19. Count IV alleges a violation of Article III, Section 4 of the Pennsylvania Constitution which provides:
   Every bill shall be considered on three different days in each House. All amendments made thereto shall be printed for the use of the members before the final vote is taken on the bill and before the final vote is taken, upon written request addressed to the presiding officer of either House by at least twenty-five percent of the members

VI[21] of the petition should be dismissed because they are essentially attacks on the manner in which legislation was enacted by the General Assembly, and based on the separation of powers doctrine and the enrolled bill doctrine, they are non-justiciable issues.

■ The separation of powers doctrine provides that no branch of government should exercise the functions exclusively committed to another branch. *Sweeney v. Tucker*, 473 Pa. 493, 375 A.2d 698 (1977). In *Sweeney*, our Supreme Court explained that, "[a] basic precept of our form of government is that the executive, the legislature and judiciary are independent, co-equal branches of government." *Id.* at 507, 375 A.2d at 705. It then held that the judiciary was not to review the constitu-

elected to that House, any bill shall be read at length in that House. No bill shall become a law, unless on its final passage the vote is taken by yeas and nays, the names of the persons voting for and against it are entered on the journal, and a majority of the members elected to each House is recorded thereon as voting in its favor.

20. Count V alleges a violation of Article III, Section 6 of the Pennsylvania Constitution which provides:
   No law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only, but so much thereof as is revived, amended, extended or conferred shall be re-enacted and published at length.

21. Count VI alleges a violation of Article III, Section 7 of the Pennsylvania Constitution which provides:
   No local or special bill shall be passed unless notice of the intention to apply therefor shall have been published in the locality where the matter of the thing to be affected may be situated, which notice shall be at least thirty days prior to the introduction into the General Assembly of such bill and in the manner to be provided by law; the evidence of such notice having been published, shall be exhibited in the General Assembly, before such act shall be passed. Necessarily, because the Reed Amendment is special legislation, we will not dismiss this count.

tionality of legislative action because such a matter was not justiciable stating the following:

> Ordinarily, the exercise of the judiciary's power to review the constitutionality of legislative action does not offend the principal of separation of powers. *See, e.g., Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). There may be certain powers which our Constitution confers upon the legislative branch, however, which are not subject to judicial review. A challenge to the Legislature's exercise of a power which the Constitution commits exclusively to the Legislature presents a nonjusticiable "political question."

*Sweeney,* 473 Pa. at 508, 375 A.2d at 705. The Court then explained that a political question existed when "the Constitution has committed to another agency of government the autonomous determination of the issue raised." *Id.* "In cases involving political questions, however, the courts will not review the actions of another branch because the determination whether the action taken is within the power granted by the Constitution has been entrusted exclusively and finally to the political branches of government for 'self-monitoring.'" *Sweeney,* 473 Pa. at 509, 375 A.2d at 706.

The Supreme Court in *Sweeney,* citing *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), set forth the standard to determine whether a case involved a political question and explained the judiciary's rationale for refusing to interfere with the operations of the legislature despite a constitutional correlation as follows:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable

standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of the government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Sweeney,* 473 Pa. at 510, 375 A.2d at 706.

■ Similarly, the Enrolled Bill Doctrine,[22] a doctrine that implements the separation of powers doctrine as it relates to the manner in which the General Assembly enacts legislation, also restrains judicial intrusion into the prerogatives of a co-equal branch of government. *Pennsylvania AFL–CIO by George.* The Enrolled Bill Doctrine, as generally formulated, provides:

> [W]hen a law has been passed and approved and certified in due form, it is no part of the duty of the judiciary to go behind the law as duly certified to inquire into the observance of form in its passage... The presumption in favor of regularity is essential to the pace and order of the state.

*Pennsylvania AFL–CIO by George,* 691 A.2d at 1031. Abstention is not mandatory, however. It is dependent upon the situation presented and is limited. *Id.* In compelling circumstances, such as confusion or deception, courts of this Commonwealth have not followed the general rule of abstention, but have looked beyond the certified law to the enactment process. *Fumo v. Pennsylvania Public Utility Commission,* 719 A.2d 10 (Pa.Cmwlth.

---

22. "An enrolled bill is a bill which has been certified by the Speaker of the House and the presiding officer of the Senate as having passed the General Assembly, which has been signed by the Governor, and which has been filed with the Secretary of the Commonwealth." *Pennsylvania AFL–CIO by George v. Commonwealth,* 691 A.2d 1023, 1031 n. 12 (Pa.Cmwlth.1997), *aff'd,* —— Pa. ——, 757 A.2d 917 (2000).

1998).[23]

The issue, then, is whether there are compelling circumstances here to warrant the Court not to follow the general rule of abstention and inquire into the manner in which Act 16 was enacted. In *Fumo,* this Court dealt with an almost identical challenge to the way an act dealing with deregulation of the utility industry was enacted. In that case, a bill was introduced into the House of Representatives on April 27, 1995, consisting of two pages that proposed to amend the Public Utility Code by increasing the maximum number of years that a taxi cab could be operated from six to eight years, and was referred to the House Consumer Affairs Committee. After being referred and reported out of several committees, the bill, still in its original form on June 5, 1995, was passed by the entire House of Representatives and was sent to the Senate. In the Senate, after going through several committees, the Bill underwent substantial modification, further amending the Public Utility Code to include the addition of 84 pages of amendments relating to the deregulation of the generation of electricity. On November 25, 1996, following debate, the Bill was passed by the Senate. Following discussion and some debate of the Bill in the House, that chamber did concur in the Senate amendments on November 25, 1996, and it was signed into law by the Governor. Challenges were brought contending that the enactment violated Sections 1, 3 and 4 of Article III of the Pennsylvania Constitution.

In that case, we found no compelling reason not to abstain because the title was amended prior to passage and the members of the General Assembly were placed on notice as to the subjects of the bills being enacted; that only the bill has to be considered on three separate days even though amended as it goes through passage because amendments do not constitutionally require another separate three days of separate consideration; and that as long as the matter deals with the general area under consideration, in this case, schools, the bill does not contain more than one subject matter because additional items relating to the original topic are expected to be added during passage.

While *Fumo* was a plurality decision, in *Pennsylvania AFL–CIO by George,* this Court and our Supreme Court agreed essentially with our reasoning that judicial intervention in the legislative process was not warranted. In *Pennsylvania AFL–CIO by George,* the appellants contended that allowing a legislative committee to amend a bill in the manner in which the Senate Rules Committee amended S.B. 801 undermined the purpose of Article III as a whole which was drafted to place restraints on the legislative process and encourage an open, deliberative and accountable government. The appellants argued, as does the Harrisburg School District here, that the procedure used to enact the Senate Bill was the "legislative equivalent of sleight of hand" in which the legislation passed by both chambers was surreptitiously rewritten by a committee of a single chamber and "then presented to the full chamber's membership in a one-time, take-it-or-leave-it, no amendments-allowed proposition." *Id.* at ——, 757 A.2d at 923. However, affirming our decision, our Supreme Court noted that:

---

**23.** As the Harrisburg School District, however, points out, this Court, in *Common Cause of Pennsylvania v. Commonwealth,* 668 A.2d 190, 195 (Pa.Cmwlth.1995), *aff'd per curiam,* 544 Pa. 512, 677 A.2d 1206 (1996), held that, "[w]hile it is appropriate to give due deference to a co-equal branch of government as long as it is functioning within constitutional constraints, it would be a serious dereliction on our part to deliberately ignore a clear constitutional violation." Additionally, in *Consumer Party of Pennsylvania v. Commonwealth,* 510 Pa. 158, 507 A.2d 323 (1986), our Supreme Court concluded that judicial intervention in the legislative process was warranted where the facts were agreed upon and the question presented was whether a violation of a mandatory constitutional provision had occurred. *Id.* at 180, 507 A.2d at 334.

[A]rticle II, Section 11 of the Pennsylvania Constitution gives the legislature the sole authority to determine the rules of its proceedings subject only to clear pronouncements in the constitution as to procedure. Pa. Const. art. II, § 11; *see also Zemprelli v. Daniels*, 496 Pa. at 257, 436 A.2d at 1170 (Senate has exclusive power over its internal affairs and proceedings as long as the exercise of that power is not violative of Pennsylvania Constitution); *Sweeney v. Tucker*, 473 Pa. 493, 518, 375 A.2d 698, 710 (1977) (legislative body has power to determine its own rules of proceeding but such power does not include power to ignore constitutional restraints or violate fundamental rights) (citing *U.S. v. Ballin*, 144 U.S. 1, 5, 12 S.Ct. 507, 36 L.Ed. 321 (1892)). As previously discussed, Article III, Section 5 contains no pronouncement, clear or otherwise, restricting an originating chamber from further amending a bill returned to it by the other chamber with amendments. Thus, while we hold that our state constitution does not proscribe a legislative chamber from making such amendments, we note that the legislature, pursuant to Article II, Section 11, is free to impose such restrictions on itself through its internal rules of proceedings.

*Id.* at ——, 757 A.2d at 923–24. Accordingly, because in *Pennsylvania AFL–CIO by George* and *Fumo* those matters that the Harrisburg School District now complains of in Counts II, IIIA and IV were not compelling reasons for the Court to intervene then, those counts are dismissed.

As to the other counts claiming constitutional defects, we also believe no compelling reason exists for us not to abstain from addressing the matters raised. Count III contends that because the SB652 containing the EEA was not printed for the members of the Rules Committee of the House to consider before their vote, it violated Article III, Section 2. Because the bill was printed for the members prior to their vote, what the Harrisburg School District seems to be contending is that every time there is an amendment, even on the House or Senate floor, the bill has to be reprinted. We can find no such requirement, and, as such, this count is dismissed. As to the claim in Count V that all of the sections of the Public School Code were not published at length in violation of Article III, Section 6, whether the section is printed in full or not is so intrusive and line drawing that the Court should abstain from deciding because that matter is not sufficiently compelling to require us to interfere with the General Assembly's operations. As such, that count is also dismissed.[24]

In summary, based on the Separation of Powers Doctrine and the Enrolled Bill Doctrine, we refuse to interfere with the integral operations of the legislature, and the Commonwealth's preliminary objection to Counts II, III, IIIA, IV and V are granted.[25] Its preliminary objection to Count VI is denied.

**24.** *See also Marrero by Tabales v. Commonwealth*, 709 A.2d 956 (Pa.Cmwlth.1998), *aff'd*, 559 Pa. 14, 739 A.2d 110 (1999), where we held that claims that the statutory scheme for funding education enacted by the General Assembly did not provide adequate funding to support educational programs necessary to meet unique educational needs of students in an urban environment were nonjusticiable under the separation of powers and political question doctrines. We stated that Article III, Section 14 of the Pennsylvania Constitution placed the responsibility for the maintenance and support of the public school system squarely in the hands of the legislature, and for that reason, we would not inquire into the reason, wisdom or expediency of the legislative policy with regard to education, issues relative to legislative determinations of school policy or the scope of educational activity. Because this case involves whether the Reed Amendment constitutes special legislation, the subject matter of the bill is irrelevant.

**25.** Because we have granted the Commonwealth's preliminary objections to Counts II, III, IIIA, IV and V, we need not address Harrisburg School District's claim that it has stated a claim for relief under Article III, Sections 1, 2, 3, 4 and 6 which correspond to the counts for which we have granted the preliminary objections.

## C. COUNT VII—UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER

█ Count VII asserts that the Reed Amendment unconstitutionally delegates legislative powers to the Mayor of Harrisburg. The Harrisburg School District argues that because the legislature and its agencies, as well as the school districts of the Commonwealth, are responsible for maintaining the system of education in the Commonwealth, the Reed Amendment, which cedes legislative power over education to the Mayor who is the chief executive of the City of Harrisburg and has unfettered power, is unconstitutional because it violates the separation of powers doctrine.

However, in *Chartiers Valley Joint Schools v. Allegheny County Board of School Directors,* 418 Pa. 520, 211 A.2d 487 (1965), our Supreme Court held that, "[w]hile the legislature cannot delegate power to make a law, it may, where necessary, confer authority and discretion in connection with the execution of the law; it may establish primary standards and impose upon others the duty to carry out the declared legislative policy in accordance with the general provisions of the act." *Id.* at 529, 211 A.2d at 492. Because the Mayor of Harrisburg has not made any law but is merely carrying out the Reed Amendment to Act 16 by appointing an education empowerment team and chairing that team, we find no unlawful delegation of legislative power and the Commonwealth's preliminary objection to Count VII is granted.

## D. COUNT VIII—EQUAL PROTECTION CLAIM

█ In Count VIII of its complaint, the Harrisburg School District alleges that it has been denied equal protection under the United States[26] and Pennsylvania Constitutions because the Reed Amendment singles it out for radically different treatment from other school districts similarly situated. More specifically, it argues that the Reed Amendment stigmatizes the students, school district and board members by singling them out for distinctive treatment by indicating that they are the most poorly served and educated students in the entire Commonwealth of Pennsylvania. It notes that the Duquesne School District has lower test scores than the Harrisburg School District but the Reed Amendment has not been applied to that district.[27]

Recently, in *Defazio, supra,* a challenge was made to an act that treated the sheriff of counties of the second class differently than counties in other classes. Our Supreme Court held that even if the legisla-

---

**26.** The Equal Protection/Due Process Clause of the United States Constitution is found at Section 1 of the Fourteenth Amendment and provides:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The Equal Protection Clause of the Pennsylvania Constitution is found at Article 1, Section 1 and provides:

All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

**27.** The Harrisburg School District also contends that the reason for its disparate treatment is because its School Board is comprised only of African–Americans. Because the legislation, if facially race neutral, the speech or debate clause (Article II, Section 15 of the Pennsylvania Constitution) would foreclose any inquiry into the purported reason behind the passage of the Reed Amendment. *See Sweeney, supra; Consumers Education and Protective Association v. Nolan,* 470 Pa. 372, 368 A.2d 675 (1977). Accordingly, that basis for violation of the equal protection clause cannot be maintained at trial.

tion was general in nature and did not violate Article III, Section 32, under equal protection, a subclass could not be created that treated any subclass differently that bore no relationship to the general class. It stated:

> Here, the Attorney General argues that the legislative classification of Allegheny County as a second class county and the unique function of the sheriff's office rest upon just such a "ground of difference" justifying the classification and the different treatment. However, the legislation in question goes beyond merely singling out Allegheny County as a class to be treated differently and in essence has effectively created a new sub-classification, that of the sheriffs of second class counties. Plainly such a sub-classification bears no relationship either to the distinction of Allegheny County as a county of the second class or to any unique function of the office of county sheriff.
>
> We find appellant's arguments to the contrary unpersuasive. While the legislature can treat different classes of counties differently, that is not what has occurred here. One particular county officer may not be treated differently from the other similar officers throughout the commonwealth merely because that officer is within a certain class of county. The distinction created by this legislation bears no fair or reasonable relationship to the object of the legislation and bears no relationship to the distinction of Allegheny County as a county of the second class.

*Id.* at 436–437, 756 A.2d at 1106. Because it has been alleged that the Harrisburg School District has been singled out, there

has been a denial of equal protection. Therefore, the Commonwealth's preliminary objection to Count VIII is denied.

### E. COUNT IX—DUE PROCESS CLAIM

■ Under Count IX, the Harrisburg School District argues that the Reed Amendment violates the due process guarantees of both the United States [28] and Pennsylvania Constitutions [29] 1) because it denies the people of Harrisburg proper notice and an opportunity for a hearing; 2) it stigmatizes the students of the Harrisburg School District while denying them the right to change their status; and 3) is unconstitutionally vague.

First, the Harrisburg School District argues that the Reed Amendment violates due process because power is being taken away from the elected School Board and given to the Mayor without the input of the people of Harrisburg. However, nothing in the federal or state due process provisions require that when the General Assembly enacts legislation that it is required to give anyone a due process hearing. In this case, the only notice required is under Article III, Section 7 of the Pennsylvania Constitution which is contained in the Harrisburg School District's count VI and has previously been addressed.

■ As to the second reason that students are stigmatized, to accept that part of the argument—that every time the General Assembly attempts to give students who are receiving a substandard education, it violates due process because it "stigmatizes" students—would mean that the legislature never could take any action to

---

**28.** *See* note 27.

**29.** Article I, Section 9, the due process clause of the Pennsylvania Constitution, provides in relevant part:

> In all criminal prosecutions the accused hath a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage; *he cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land.* (Emphasis added.)

rectify low achieving districts. As to its argument that once the shift in power has been effected, the Harrisburg School District will not be able to petition for removal from the Education Empowerment List for a minimum of five years to change its status, that argument is more of an equal protection argument that we also dealt with previously.

■ Finally, as to its argument that the Reed Amendment violates due process because it is unconstitutionally vague in giving the Mayor power to appoint an empowerment team, the language is no more vague than when the General Assembly gives power to a school district to operate under the laws of the Commonwealth. Accordingly, there has been no deprivation of due process and this Count is also dismissed.

Accordingly, for all of the reasons stated above, the Commonwealth's preliminary objections to Counts I, VI and VIII are denied but its objections to Counts II, III, IIIA, IV, V, VII and IX are granted.[30] The preliminary objections filed by Governor Ridge are granted and he is stricken as a Respondent.

### ORDER

AND NOW, this 13th day of November, 2000, the preliminary objections filed by the Commonwealth to Counts I, VI and VIII of the petition filed by the Harrisburg School District are denied. Its preliminary objections to Counts II, III, IIIA, IV, V, VII and IX are granted. The Commonwealth's request to have paragraphs 58a and 58b stricken from the amended petition as scandalously impertinent is granted. The preliminary objections filed by Governor Ridge are granted and he is stricken as a Respondent.

The Commonwealth has thirty (30) days from the date of this order to file an answer.

KELLEY, Judge, concurring.

I concur in the result reached by the Majority Opinion in this case. In particular, I agree with the Majority's disposition of the Commonwealth's preliminary objections to Counts I, VI, VII, VIII, and IX in the Harrisburg School District's petition for review. I write separately, however, to express my strong disagreement with the Majority's determination that the claims asserted in Counts II, III, IV, and V in the petition for review are non-justiciable based on the Enrolled Bill Doctrine and the Political Question Doctrine.

In support of its conclusion that these claims are non-justiciable, the Majority relies upon the opinion of the Pennsylvania Supreme Court in *Pennsylvania AFL–CIO v. Commonwealth*, —— Pa. ——, 757 A.2d 917 (2000). However, the Majority's reliance upon *Pennsylvania AFL–CIO* is misplaced as the Supreme Court's opinion absolutely does not support the conclusion that these claims are non-justiciable. In fact, in its opinion the Pennsylvania Supreme Court stated the following, in pertinent part:

> As a threshold issue, Appellees, as cross-Appellants, assert that the Commonwealth Court erred in overruling their preliminary objections with respect to the justiciability of Appellants' constitutional claims. They argue that, contrary to the Commonwealth Court's finding, judicial inquiry into Appellants' claims is barred by the Enrolled Bill Doctrine, the Political Question Doctrine and the Speech and Debate Clause. We disagree. Instead, we conclude that the Commonwealth Court properly disposed of these issues pursuant to well-developed case law and, therefore, affirm the overruling of Appellees' preliminary objections as to the justiciability of Appellants' constitutional claims on the basis of the Commonwealth Court's opinion. *See Pennsylvania AFL–CIO v. Com-*

---

30. Finally, the Commonwealth's request to have paragraphs 58a and 58b stricken from

the amended petition as scandalously impertinent is granted.

*monwealth,* 691 A.2d 1023, 1030–1034 (Pa.Commw.1997).

*Id.* at 920.

In support of its determination that these claims are non-justiciable, the Majority also cites the opinion of this Court in *Fumo v. Pennsylvania Public Utility Commission,* 719 A.2d 10 (Pa.Cmwlth. 1998). However, it must be noted that a majority of the members of the panel of this Court which considered the *Fumo* case did not join in the reasoning of the opinion disposing of the appeal; two members concurred in the result only and two members dissented. As a result, the opinion in *Fumo* is a non-precedential plurality decision. *See, e.g., McDermott v. Biddle,* 436 Pa.Super. 94, 115 n. 8, 647 A.2d 514, 524 n. 8 (1994), *rev'd on other grounds,* 544 Pa. 21, 674 A.2d 665 (1996) ("[I]n order for any principle of law expressed in the majority opinion to be considered precedent it must command a majority of judges voting both as to the disposition and the principle of law expressed."); *Askew v. Zeller,* 361 Pa.Super. 35, 39–41, 521 A.2d 459, 462 (1987) ("[U]nless an issue in a panel decision commands a majority both as to the result and as to rationale, the principle embodied in the issue is not precedential...").

In this case, the Harrisburg School District has alleged that the enactment of Act 16 violated a number of provisions of Article 3 of the Pennsylvania Constitution. As this Court has previously determined, the Enrolled Bill Doctrine and the Political Question Doctrine do not preclude our review of such important constitutional claims. *See Common Cause/Pennsylvania v. Commonwealth,* 710 A.2d 108, 118 (Pa. Cmwlth.1998), *aff'd,* 562 Pa. 632, 757 A.2d 367 (2000); *Pennsylvania AFL–CIO,* 691 A.2d at 1033. However, upon review, I would conclude that the enactment of Act 16 did not violate the substantive provisions of Article III, Sections 1, 2, 3, 4 and 6 of the Pennsylvania Constitution as alleged by the Harrisburg School District. *See L.J.W. Realty Corp. v. Philadelphia,* 390 Pa. 197, 205, 134 A.2d 878, 882 (1957); *Common Cause/Pennsylvania,* 710 A.2d at 119–121; *Pennsylvania AFL–CIO,* at 1034–1037. As a result, I agree with the Majority's conclusion that the Commonwealth's preliminary objections to Counts I, VI and VIII of the Harrisburg School District's petition for review should be denied, and that the preliminary objections to Counts II, III, IV, V, VII and IX should be granted.

COLINS, Judge, concurring and dissenting.

I concur in the majority's dismissal of Counts II through V, VII, and IX through XI of the School District's complaint. I would also dismiss Counts I, VI, and VIII; therefore, I dissent to the majority opinion insofar as it denies the Commonwealth's preliminary objections to those counts.

I disagree with the majority's conclusion that Act 16 constitutes special legislation in violation Article III, Section 32 of the Pennsylvania Constitution. Act 16 is not legislation for a particular locality or for a private purpose; rather, it was written to address a problem that affects school districts statewide and it applies to all school districts. One small part of Act 16, the Reed Amendment, creates a class of one, Harrisburg, the state capital, but the Commonwealth has stated rational reasons that justify the legislature's special treatment of Harrisburg, and comparatively, the Harrisburg School District is among the most in need of the potential benefits of immediate application of Act 16. The Reed Amendment does not treat the education of Harrisburg school students as more "special" than that of other students in the Commonwealth; rather, it recognizes that Harrisburg school students already have a history of low test scores, and puts it on a fast track to real educational reform. Where the need is so great, the circumstances justify going beyond an advisory team and putting the empowerment framework into the hands of

a proven leader, Harrisburg Mayor Stephen Reed.

Similarly, equal protection principles do not prohibit the Commonwealth from classifying school districts for the purpose of receiving different treatment and do not require equal treatment of school districts having different needs. *Defazio v. Civil Service Commission*, 562 Pa. 431, 436–438, 756 A.2d 1103, 1106 (2000) (quoting *Curtis v. Kline*, 542 Pa. 249, 253–257, 666 A.2d 265, 267–68 (1995)). As I have stated, I believe that Act 16's classification of Harrisburg for special treatment under the Reed Amendment was a reasonable classification, and the classification has a fair and substantial relationship to the object of the legislation; i.e., local education empowerment with an eye to reform and increasing students' test scores.

In Act 16, the General Assembly has addressed the threat to the Commonwealth posed by low student test scores. Within that framework, the Reed Amendment acknowledges that the threat has become a longstanding reality in the Harrisburg School District, and the legislature made it possible for local officials to take the necessary steps to address the problem with dispatch. For these reasons, I would dismiss the School District's complaint in its entirety.